NATURAL RESOURCES DEFENSE COUNCIL, INC., et al., Petitioners,

v.

NUCLEAR REGULATORY COMMISSION and United States of America, Respondents,

Westinghouse Electric Corporation, Intervenor.

No. 80–1477.

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 26, 1980.

Decided March 30, 1981.

---

Clifton E. Curtis, Washington, D. C., with whom James N. Barnes, Leonard C. Meeker, S. Jacob Scherr, Thomas B. Stoel, Jr., Graeme W. Bush, James B. Dougherty and Ellyn Weiss, Washington, D. C., were on the brief, for petitioner.

Carlton R. Stoiber, Deputy Gen. Counsel, Nuclear Regulatory Commission of the bar of the Supreme Court of Colorado, Washington, D. C., by special leave of Court pro hac vice with whom Leonard Bickwit, Jr., Gen. Counsel, Nuclear Regulatory Commission, Stephen F. Eilperin, Sol. and Irwin B. Rothschild, III, Atty., Nuclear Regulatory Commission, Washington, D. C., were on the brief, for respondent, Nuclear Regulatory Commission.

Peter R. Steenland, Jr., Atty., Dept. of Justice, Washington, D. C., with whom Sanford Sagalkin, Acting Asst. Atty. Gen., David C. Shilton, Atty., Dept. of Justice, Mark B. Feldman, Deputy Legal Adviser, Dept. of State, and Ronald J. Bettauer, Asst. Legal Adviser, Dept. of State, Washington, D. C., were on the brief, for respondent United States.

Peter D. Trooboff, Washington, D. C., with whom Brice M. Clagett and Paul G. Gaston, Washington, D. C., were on the brief, for amicus curiae urging that the Commission's decision to grant the nuclear export licenses be upheld.

Barton Z. Cowan, Pittsburgh, Pa., with whom John R. Kenrick, John J. Myers, Pittsburgh, Pa., Christopher H. Buckley, Jr., Jonathan Z. Cannon, Washington, D. C., and John R. Erbey, Pittsburgh, Pa., were on the brief, for intervenor.

Before SPOTTSWOOD W. ROBINSON, III, WILKEY and GINSBURG *, Circuit Judges.

WILKEY, Circuit Judge:

This appeal raises the issue of whether and to what extent "effective control" of nuclear exports requires the Nuclear Regulatory Commission (NRC or Commission) to consider projected health and safety impacts associated with an exported reactor in the recipient foreign country. To answer this question it is necessary to look closely at the complex statutory mandate for atomic energy.

OUTLINE

I. BACKGROUND

    A. *Export License Proceedings*

    B. *The Philippines' Application*

    C. *The Commission's Decision*

        1. Atomic Energy Act.

        2. National Environmental Policy of 1969 (NEPA).

        3. Separate Opinions.

II. PRELIMINARY DISCUSSION

    A. *The Issues*

    B. *Examining Foreign Impacts in General*

        1. How could consideration by the NRC, in a domestic decisionmaking context, of health, safety and environmental impacts in the Phillipines "constitute[ ] an exercise of American sovereign power within the area of the foreign country's territorial sovereignty"?

        2. Do the actions of the NRC affect the foreign relations of the United States?

    C. *Legal Standard of Review*

* Judge Ginsburg took no part in the disposition of this case.

III. THE ATOMIC ENERGY ACT AS AMENDED BY NNPA
   A. *Congressional Purpose*
   B. *Environmental Protection Standards*
      1. Statutes.
      2. Precedents.
   C. *"Non-Inimicality"*
      1. Not inimical to the "common defense and security."
         a. *Policy considerations.*
         b. *Reliance on the executive.*
      2. Not inimical to the "health and safety of the public."

IV. NEPA REQUIREMENT AS TO EXTRATERRITORIAL IMPACTS
   A. *Legislative History*
   B. *Judicial Precedents*

V. CONCLUSION

One important object of our nuclear energy laws in the international area is nonproliferation. Nonproliferation cannot be achieved by nonparticipation by the United States in the world commerce in nuclear machinery and materials; our policy set by the Congress recognizes that American abstention from international nuclear trade risks leaving the field to less responsible suppliers and encouraging uncontrolled proliferation. Reliable exports from the United States of reactors and fissile materials are thus a necessary implement of nuclear nonproliferation and nuclear safety control. Such assurance of reliability casts the United States as an attractive supplier for international customers intent upon developing their own national nuclear power programs. An attractive supplier, Congress hoped, would make reliance on "less responsible" sources for nuclear development unnecessary. American safety standards would naturally be built in, and exported along with the American products sold abroad. More importantly, however, the United States, as a nuclear supplier insisting on nonproliferation standards, is committed to being "more responsible" for the prevention of uncontrolled proliferation of nuclear weapons. Thus, nonproliferation, safety, and nuclear exports from the United States march in tandem.

In furtherance of these objectives Congress has created a regulatory and foreign policy regime designed to ensure "effective controls by the United States over its exports of nuclear materials and equipment and of nuclear technology."[1] The Commission decided in the case before us to license a nuclear export without evaluating health, safety and environmental impacts *within the recipient nation.* We must judge the conformity of that decision with the Atomic Energy Act of 1954 (the Act),[2] as amended by the Nuclear Non-Proliferation Act of 1978 (NNPA).[3] My review of the two acts leads me to conclude that the Commission acted lawfully in declining to consider foreign impacts. Its deference to the evaluation and foreign policy judgment made by the executive appears to me fully consistent with the objectives set by Congress.

Furthermore, I cannot find that the National Environmental Policy Act of 1969 (NEPA)[4] imposes an environmental impact

1. 22 U.S.C. § 3202(d) (Supp. II 1978).

2. 42 U.S.C. § 2011 *et seq.* (1976).

3. 22 U.S.C. § 3201 *et seq.* (Supp. III 1979).

4. 42 U.S.C. § 4321 *et seq.* (1976).

statement (EIS) requirement on nuclear export decisions with respect to impacts falling exclusively within foreign jurisdictions. Within the language of the statute, solicitude for the President's prerogative in foreign relations dictates that NEPA's putative extra-territorial reach be curbed in the case of nuclear exports. Here, nonproliferation and foreign policy objectives superimpose a special perspective on the singular goal NEPA serves in the wholly domestic context. For international nuclear transactions, it appears to be the will of Congress that bilateral or multilateral cooperation respecting the environment take precedence over unilateral American efforts.

The Commission, on 6 May 1980, authorized the export by Westinghouse Electric Corporation (Westinghouse) to the Philippines of (a) a nuclear reactor, and (b) complementary nuclear materials. On 10 December 1980 this court denied petitioners' motion for a stay enjoining shipments of

some of those materials. Today we uphold the Commission's two orders of 6 May 1980.

## I. BACKGROUND

### A. *Export License Proceedings*

The Commission concluded, in the first order[5] here under review, that Westinghouse's export license applications met all applicable licensing criteria required by the Atomic Energy Act as amended by NNPA. The exports, the Commission believed, "would not create unacceptable health, safety or environmental risks to U.S. territory or the global commons."[6] In the second order[7] the Commission declared that it would "only consider those health, safety and environmental impacts arising from exports of nuclear reactors that affect the territory of the United States or the global commons."[8] Petitioners, various organizations representing environmental interests, have challenged the Commission's decision to grant the export licenses. Westinghouse, the prospective exporter, has intervened. The Republic of the Philippines, as *amicus curiae*, has also appeared before us.[9]

---

**5.** *Westinghouse Electric Corporation*, CLI–80–14, 11 N.R.C.——(6 May 1980), *reprinted in* Joint Appendix (J.A.) at 1–2.

**6.** *Id.*

**7.** *Westinghouse Electric Corporation*, CLI–80–15, 11 N.R.C.——(6 May 1980), *reprinted in* J.A. at 3–4 [hereinafter citation will be only to J.A. page number].

**8.** *Id.* "U.S. territory" was defined to mean the territory of the 50 states plus the trust territories and possessions of the United States. *See id.* at 39 n.63. "Global commons" signifies the high seas, Antarctica, and portions of the atmosphere outside the sovereign jurisdiction of a single nation. *See id.* at 10 n.15. The Commission also held that individual shipments of fuel and component parts are not "major federal actions" because they pose only *de minimis* health, safety and environmental impacts. The Commission's consistent position to this effect was established earlier, for example, in *Edlow International*, 3 N.R.C. 563, 584 (1976). On 8 February 1980 the Commission entered an order acknowledging comments on the scope of its jurisdiction and soliciting further comments as to potential impacts in the United States or global commons. *See* 45 Fed.Reg. 10,099 (14 Feb. 1980). Westinghouse, an intervening party, has argued that petitioners' Petition for Review filed on 6 May 1980 was untimely according to the sixty-day requirement of 28 U.S.C. § 2344 (1976). *See* Brief for Intervenor at 18–23. Westinghouse claims that since the Com-

mission's position on its jurisdiction was definitively pronounced and reviewable as of 8 February, this court is prohibited by that statute from reconsidering the Commission's jurisdictional determination. We reject this argument entirely. The 8 February order was simply not a § 2344 "final order." It neither denied nor granted any export licenses, nor precluded further review by the NRC of any issues. I proceed with my review of the two orders of 6 May.

**9.** *See generally* Brief *Amicus Curiae* of the Republic of the Philippines. Basically, the *amicus* brief seeks to assure the court that the Philippines has responsibly undertaken to assess and protect the Philippines environment from the risks associated with the import of the Westinghouse nuclear reactor. The brief outlines extensive nuclear regulatory and review procedures mandated by Philippines law. Moreover, the Philippines asserts that refusal to permit the export on the grounds raised by petitioners would constitute an unwarranted intrusion into its internal affairs. In short, *amicus* argues that NRC consideration of impacts in the Philippines would improperly "substitut[e] United States regulatory standards for the Republic's own." *Id.* at 23. In bringing the sovereignty issue to bear on this court, *amicus* suggests the difficult cross-jurisdictional concepts with which we must grapple: "While the Republic clearly has sole jurisdiction over conduct in the Philippines, it recognizes that the United States

The procedural framework applicable to applications for nuclear export licenses is established in section 126 of the amended Atomic Energy Act.[10] The process is quite detailed and entails both administrative and executive participation. A brief outline of the regulatory scheme is as follows:

A prospective nuclear exporter files with the NRC an application for an export license. The NRC forwards the application to the Department of State, thereby triggering executive branch review by the Departments of State, Defense, Commerce, and Energy, as well as the Arms Control and Disarmament Agency. The NRC considers the application concurrently with the review undertaken within the executive. The executive branch must then forward to the Commission its recommendation concerning the issuance of the license. Having received the executive's views, the Commission must then act within sixty days, or alternatively, inform the applicant of the reasons for the delay, and provide follow-up reports. Sixty days after that, the President may withdraw the license application from the Commission if it has not yet acted, and authorize the export by executive order. Presidential authorization would be contingent upon a determination that "fur-

ther delay would be excessive" and that "*withholding* the proposed export would be seriously prejudicial to the *achievement of United States non-proliferation objectives,* or would otherwise *jeopardize the common defense and security.*" [11]

On the other hand, if the Commission does not issue a license because it finds itself unable to make the required statutory determinations, then the Commission may refer the pending license back to the President. The President may then rule on the license application subject to no statutory time limits. A presidential decision, however, in either the "withdrawal" or "referral" context, may be reviewed within sixty days by Congress. By a resolution of disapproval Congress may block a nuclear export authorized by the President (as opposed to one authorized by the NRC pursuant to the prerequisite executive recommendation). Finally, the Commission may also order public proceedings. In such event, the statutory time constraint on NRC action is extended until another sixty days after the termination of the proceeding.

Sections 127 and 128 of the Act [12] stipulate several licensing criteria whose satisfaction must be determined by the Commission before it can issue the export license. Those criteria are set out in full in the margin.[13] But most importantly for the

---

has jurisdiction to determine whether or not an export license should be issued." *Id.* at 20.

**10.** 42 U.S.C. § 2155 (Supp. II 1978); *see also* 10 C.F.R. §§ 110–13 (1980).

**11.** 42 U.S.C. § 2155(b)(2) (Supp. II 1978) (emphasis added). It would appear from this provision that Congress imagined situations in which the *withholding* of a nuclear export might actually "jeopardize the common defense and security." This contrasts with the petitioners' viewpoint that the *authorization* of a nuclear export is the threat to the "common defense and security." The statutory language is pliable; both viewpoints are legitimate. We know only that Congress expected that "achievement of United States non-proliferation objectives" would be enhanced by promoting nuclear exports in appropriate circumstances.

**12.** 42 U.S.C. §§ 2156, 2157 (Supp. II 1978).

**13.** § 2156. Criteria governing United States nuclear exports
The United States adopts the following criteria which, in addition to other requirements

of law, will govern exports for peaceful nuclear uses from the United States of source material, special nuclear material, production or utilization facilities, and any sensitive nuclear technology:
(1) IAEA safeguards as required by Article III(2) of the Treaty will be applied with respect to any such material or facilities proposed to be exported, to any such material or facilities previously exported and subject to the applicable agreement for cooperation, and to any special nuclear material used in or produced through the use thereof.
(2) No such material, facilities, or sensitive nuclear technology proposed to be exported or previously exported and subject to the applicable agreement for cooperation, and no special nuclear material produced through the use of such materials, facilities, or sensitive nuclear technology, will be used for any nuclear explosive device or for research on or development of any nuclear explosive device.
(3) Adequate physical security measures will be maintained with respect to such material or facilities proposed to be exported and to any special nuclear material used in or produced through the use thereof. Following

legal issue in dispute in this case, the Commission must determine under section 103(d) of the Act that the proposed reactor export "would [not] be inimical to the com-

the effective date of any regulations promulgated by the Commission pursuant to section 2156a of this title, physical security measures shall be deemed adequate if such measures provide a level of protection equivalent to that required by the applicable regulations.

(4) No such materials, facilities, or sensitive nuclear technology proposed to be exported, and no special nuclear material produced through the use of such material, will be retransferred to the jurisdiction of any other nation or group of nations unless the prior approval of the United States is obtained for such retransfer. In addition to other requirements of law, the United States may approve such retransfer only if the nation or group of nations designated to receive such retransfer agrees that it shall be subject to the conditions required by this section.

(5) No such material proposed to be exported and no special nuclear material produced through the use of such material will be reprocessed, and no irradiated fuel elements containing such material removed from a reactor shall be altered in form or content, unless the prior approval of the United States is obtained for such reprocessing or alteration.

(6) No such sensitive nuclear technology shall be exported unless the foregoing conditions shall be applied to any nuclear material or equipment which is produced or constructed under the jurisdiction of the recipient nation or group of nations by or through the use of any such exported sensitive nuclear technology.

*Id.*

**§ 2156a. Regulations establishing levels of physical security to protect facilities and material**

Within sixty days of March 10, 1978, the Commission shall, in consultation with the Secretary of State, the Secretary of Energy, the Secretary of Defense, and the Director, promulgate (and may from time to time amend) regulations establishing the levels of physical security which in its judgment are no less strict than those established by any international guidelines to which the United States subscribes and which in its judgment will provide adequate protection for facilities and material referred to in paragraph (3) of section 2156 of this title taking into consideration variations in risks to security as appropriate.

*Id.* § 2156a.

**§ 2157. Additional export criterion and procedures**

(a)(1) As a condition of continued United States export of source material, special nuclear material, production or utilization facilities, and any sensitive nuclear technology to non-nuclear-weapon states, no such export shall be made unless IAEA safeguards are maintained with respect to all peaceful nuclear activities in, under the jurisdiction of, or carried out under the control of such state at the time of the export.

(2) The President shall seek to achieve adherence to the foregoing criterion by recipient non-nuclear-weapon states.

(b) The criterion set forth in subsection (a) of this section shall be applied as an export criterion with respect to any application for the export of materials, facilities, or technology specified in subsection (a) of this section which is filed after eighteen months from March 10, 1978, or for any such application under which the first export would occur at least twenty-four months after March 10, 1978, except as provided in the following paragraphs:

(1) If the Commission or the Department of Energy, as the case may be, is notified that the President has determined that failure to approve an export to which this subsection applies because such criterion has not yet been met would be seriously prejudicial to the achievement of United States non-proliferation objectives or otherwise jeopardize the common defense and security, the license or authorization may be issued subject to other applicable requirements of law: *Provided,* That no such export of any production or utilization facility or of any source or special nuclear material (intended for use as fuel in any production or utilization facility) which has been licensed or authorized pursuant to this subsection shall be made to any non-nuclear-weapon state which has failed to meet such criterion until the first such license or authorization with respect to such state is submitted to the Congress (together with a detailed assessment of the reasons underlying the President's determination, the judgment of the executive branch required under section 2155 of this title, and any Commission opinion and views) for a period of sixty days of continuous session (as defined in section 2159(g) of this title) and referred to the Committee on International Relations of the House of Representatives and the Committee on Foreign Relations of the Senate, but such export shall not occur if during such sixty-day period the Congress adopts a concurrent resolution stating in substance that the Congress does not favor the proposed export. Any such license or authorization shall be considered pursuant to the procedures set forth in section 2159 of this title for the consideration of Presidential submissions.

(2) If the Congress adopts a resolution of disapproval pursuant to paragraph (1), no further export of materials, facilities, or technology specified in subsection (a) of this section shall be permitted for the remainder of that Congress, unless such state meets the

mon defense and security or to the health and safety of the public" of the United States.[14]

### B. *The Philippines' Application*

On 17 June 1974 the government of the Philippines, acting through its wholly owned National Power Corporation, undertook to acquire from Westinghouse the country's first nuclear generator. The 620 megawatt nuclear power plant was to be constructed at Napot Point, Municipality of Morong, Province of Bataan, on the island of Luzon in the Philippines, and was designated Philippines Nuclear Power Project # 1 (PNPP–1). The Export-Import Bank of the United States in January 1976 authorized loans and loan guarantees upwards of $600 million to finance PNPP–1.[15]

On 18 November 1976 Westinghouse filed an export license application for the Philippines reactor with the NRC. The Commission submitted the application to the executive branch which recommended issuance on

12 December 1977. However, on 25 January 1978 the Department of State, wishing to make its own further studies, requested that the NRC defer action on Westinghouse's application. The Napot Point site is about twelve miles from the Subic Bay Naval Base and forty miles from Clark Air Force Base where a total of 32,000 American armed service members are stationed. This area is also seismically active. These considerations motivated the Department to think further about the suitability of the reactor site, along with certain alleged contractual improprieties, and a few other concerns. Construction at Napot Point continued with materials not subject to NRC licensing requirements.

Department of State concerns were evidently assuaged by the response of the Philippine Atomic Energy Commission. The regulatory body of the Philippines called, in turn, upon the International Atomic Energy Agency as well as its own specially convened "Puno Commission." So on 3 November 1978 the executive branch advised the NRC that it recommended the issuance

criterion or the President notifies the Congress that he has determined that significant progress has been made in achieving adherence to such criterion by such state or that United States foreign policy interests dictate reconsideration and the Congress, pursuant to the procedure of paragraph (1), does not adopt a concurrent resolution stating in substance that it disagrees with the President's determination.

(3) If the Congress does not adopt a resolution of disapproval with respect to a license or authorization submitted pursuant to paragraph (1), the criterion set forth in subsection (a) of this section shall not be applied as an export criterion with respect to exports of materials, facilities and technology specified in subsection (a) of this section to that state: *Provided,* That the first license or authorization with respect to that state which is issued pursuant to this paragraph after twelve months from the elapse of the sixty-day period specified in paragraph (1), and the first such license or authorization which is issued after each twelve-month period thereafter, shall be submitted to the Congress for review pursuant to the procedures specified in paragraph (1): *Provided further,* That if the Congress adopts a resolution of disapproval during any review period provided for by this paragraph, the provisions of paragraph (2)

shall apply with respect to further exports to such state.
*Id.* § 2157.

14. In full, § 103(d) reads:
(d) No license under this section may be given to any person for activities which are not under or within the jurisdiction of the United States, except for the export of production or utilization facilities under terms of an agreement for cooperation arranged pursuant to section 2153 of this title, or except under the provisions of section 2139 of this title. No license may be issued to an alien or any any [*sic*] corporation or other entity if the Commission knows or has reason to believe it is owned, controlled, or dominated by an alien, a foreign corporation, or a foreign government. In any event, no license may be issued to any person within the United States if, in the opinion of the Commission, the issuance of a license to such person would be inimical to the common defense and security or to the health and safety of the public.
*Id.* § 2133(d).

15. A treaty between the Philippines and the United States was negotiated in 1968 establishing a general framework for nuclear sales to the Philippines. *See* Agreement for Cooperation Concerning Civil Uses of Atomic Energy, 13 June 1968, 19 U.S.T. 5389, T.I.A.S. No. 6522.

of an export license for the proposed reactor's component parts. On 28 September 1979 the executive informed the Commission of its view that the proposed reactor itself met all export licensing requirements and recommended the issuance of the license. At this time the executive branch submitted to the NRC a "Concise Environmental Review" discussing siting and environmental considerations, and the Philippines nuclear regulatory process. On 19 October 1979 the Commission ordered public proceedings to address the statutory licensing determinations.[16] The next NRC order on 8 February 1980 solicited public comment on the effects that the proposed export might have on the global commons, United States territory, and the common defense and security of the United States.[17] On 6 May 1980 the Commission issued the two orders here under review.

#### C. *The Commission's Decision*

##### 1. Atomic Energy Act.

The Commission issued the export license to Westinghouse on 6 May 1980, having determined by a split vote that the statutory criteria were all satisfied.[18] The Commission simultaneously decided that its consideration of health, safety and environmental impacts was properly confined to those that affect the territory of the United States or the global commons.[19] The Commission held that it was without jurisdiction to consider "impacts upon the citizens of the recipient nation," the Philippines.[20] This conclusion was based on the Commission's understanding that federal statutes apply only to conduct within, or having effect within, the territorial United States,

unless the contrary is manifest in the statute itself. As to United States interests abroad, such as potential impacts on American armed service members based in the Philippines, the Commission held that its "legislative mandate neither compels nor precludes examination of such impacts. The decision whether to examine such effects is thus a question of policy to be decided as a matter of agency discretion."[21]

The Commission concluded that prevailing considerations of policy did not call for consideration by the agency itself of foreign impacts on American interests.[22] The Commission pointed out that the effect of foreign impacts would be assimilated in the export licensing process in any event. Whatever judgment the agency might reach, the executive branch, pursuant to Executive Order No. 12,114,[23] will assess these foreign impacts in making its recommendation to the Commission.[24]

With regard to impacts on the global commons, the Commission adopted a median position. It eschewed a comprehensive review citing the absence of legislative or judicial guidance, but determined on policy grounds that NRC review of these impacts could be "based upon generally available literature, such as generic environmental impact statements prepared by the Commission and other federal agencies, information contained in environmental assessments prepared by the Executive Branch pursuant to E.O. 12114, and calculations prepared by the NRC staff based on analytical models . . . ."[25]

All of the above considerations were factored into the Commission's finding that

---

**16.** *See* 44 Fed.Reg. 61,475 (25 Oct. 1979). For a summary of the arguments advanced by more than 25 organizations, groups, companies, and individuals, see Philippine Export License Application, *reprinted in* J.A. at 246–60.

**17.** *See* notes 8, 16 *supra.* Twelve submissions were received by the Commission including one from petitioners. *See* J.A. at 128–37.

**18.** *See* J.A. at 1.

**19.** *See id.* at 3. Two of the five NRC Commissioners disagreed with this holding.

**20.** *Id.* at 12. Our citations to the Commission's decision refer to the plurality opinion of Commissioners Kennedy and Hendrie in whose result Commissioner Gilinsky concurred [hereinafter *NRC Decision* ].

**21.** *Id.* at 23.

**22.** *See id.* at 26–30.

**23.** 44 Fed.Reg. 1957 (1979).

**24.** *NRC Decision*, J.A. at 30.

**25.** *Id.* at 32.

issuing the Philippines export license would not be "inimical to the common defense and security or to the health and safety of the public."[26] This finding of "non-inimicality," of course, is required by section 103(d) of the Atomic Energy Act.[27] Petitioners contend, as one of their principal arguments, that the Commission, by so narrowly confining its environmental review, violated its obligation to make the section 103(d) finding of "non-inimicality." Before such a finding can be made, petitioners urge, the Commission is bound to consider the adequacy of the reactor design, the site location, operation requirements, and environmental effects. Conversely, the Commission reasoned "that more comprehensive reviews could intrude upon foreign sovereignty and that the responsibility for protecting the health and safety of U. S. citizens residing abroad resides with the recipient nation."[28]

### 2. National Environmental Policy Act of 1969 (NEPA).

An environmental impact statement evaluating the environmental consequences of the nuclear export to the Philippines was not prepared. The Commission interpreted NEPA to require consideration of environmental impacts on the United States, and to permit consideration of impacts on the global commons.[29] Relying on public comments and generic environmental analyses,[30] the Commission stated its view "that the im-

pacts on the global commons and U.S. territory that would result from the reactor export do not rise to a level of magnitude that would require us to vote to deny the export licenses."[31] It was the Commission's judgment that even in the worst case, such as a meltdown of the exported reactor's core, the impact on the global commons and United States territory would be "extremely small" and "insignificant."[32] Regarding storage of spent fuel and nuclear waste, the Commission also decided that "storage on site would not have adverse impacts upon the global commons or U.S. territory."[33]

The Commission explained its decision not to evaluate site-specific impacts on the global commons by emphasizing that United States regulatory officials are constrained by principles of national sovereignty from insisting on visits to sites within foreign territory.[34] Absent such visits, reliance on generic analyses, extrapolation from domestic environmental impact statements, and information gathered and submitted to the NRC by the executive branch in its concise environmental review (prepared pursuant to Executive Order No. 12,114), is sufficient. The Commission noted as well that it had undertaken several specific cooperative programs with the Philippines to implement NEPA's section 102(2)(F)[35] requirement that agencies "maximize international cooperation" to prevent deterioration of the worldwide environment.[36] A regula-

---

**26.** *Id.* at 36.

**27.** 42 U.S.C. § 2133(d) (1976). *See* note 14 *supra.*

**28.** *NRC Decision*, J.A. at 36 (footnote omitted).

**29.** *See id.* at 39.

**30.** The NRC staff "prepared a technical analysis providing an approximate evaluation of the potential radiological impacts upon the global commons that could result from the operation of the Napot Point reactor." *Id.* at 39. Moreover, the Commission had the benefit of the programmatic environmental impact statement on "U.S. Nuclear Power Export Activities" (ERDA–1542) prepared by the Energy Research and Development Administration (now the Department of Energy). *See Final Environmental Statement, U.S. Nuclear Power Export Activities*, EIS No. 76–0523 (1976), NRC A/R Vol. 8, Doc. 2. "The statement addresses impacts of

nuclear exports on U.S. territory and the portions of the world's oceans over which no sovereign nation claims control and concludes that the 'level of projected U.S. activities through the year 2000 should not entail significant and unacceptable adverse environmental impacts to the U.S.'." *NRC Decision*, J.A. at 40.

**31.** *Id.* at 42.

**32.** *Id.* at 43.

**33.** *See id.* at 44. "Were U.S. territory used [for storing spent fuel], an EIS would, of course, be prepared." *Id.*

**34.** *See id.* at 44–45.

**35.** 42 U.S.C. § 4332(2)(F) (1976).

**36.** *See NRC Decision*, J.A. at 45–46.

**1354**

tory information exchange agreement reached with the Philippines on 28 April 1980 ensures that the Philippines Atomic Energy Commission will regularly receive NRC regulatory guidelines, safety information, including Three Mile Island-related documentation and staff reports, and any information it requests.[37]

3. Separate Opinions.

The foregoing synopsis of the NRC decision in this case refers to the plurality opinion of Commissioners Kennedy and Hendrie. Commissioner Gilinsky concurred "in the result reached by the Commission ... that ... favorable findings on the health, safety and environmental impacts of U.S. nuclear exports abroad should not be a condition of export authorization by the NRC."[38] Commissioner Gilinsky underscored the importance of reactor operation and training of plant managers and operators as primary safety features.[39] He stated that the Commission was simply not in a position to "go to the heart of the safety issue" of exported reactors.[40]

Commission Chairman Ahearne and Commissioner Bradford each dissented separately from the decision to grant the export licenses. The Chairman agreed that the Commission was without jurisdiction to evaluate effects on the citizens and interests of the recipient nation. He dissented, however, because of his view that some limited review of available information on impacts affecting United States interests in the recipient country should be undertaken by the Commission. He wrote:

The Commission did not fully articulate its position on the question of jurisdictional reach until this decision. I find it not possible to simultaneously evaluate the appropriate jurisdictional reach and whether the Commission position warrants granting the export in this case

(although I suspect that it does). Therefore, I abstain from the Commission's determination on the pending application.[41]

Only Commissioner Bradford's dissent represents a substantive disagreement about the scope of the NRC's statutory obligations. "Thus," he wrote,

our legal responsibility to consider the common defense and security, our legal responsibility to consider the health and safety of American populations living overseas, and a policy determination to take some effective responsibility for the safe use of our exports all merge in the direction of a more comprehensive review than the Commission has chosen to undertake.[42]

Furthermore, Commissioner Bradford adduced the following considerations in response to Commissioner Gilinsky's point:

The conclusion should not be that no review is in order because the review cannot guarantee safe operation. It should be that, because the U.S. has little control over the operating practices or quality assurance and control programs, we should at least do what we reasonably can to advise at the outset on the safety of the site, the design, and the regulatory program.[43]

The Commissioner did not feel, however, "that such a review could be a basis for the denial of an export in any but the most extraordinary case."[44] He did feel, though, that a foreign accident as severe as Three Mile Island would be inimical to the common defense and security and, perhaps, the health and safety of local Americans.[45] Finally, the dissent suggests that NRC review of local impacts around the Philippines reactor would not necessarily be any more intrusive than the nonproliferation reviews required by international treaties. Commissioner Bradford voted against issuing

**37.** *See id.* at 46.

**38.** *Gilinsky Opinion, id.* at 49 (footnotes omitted).

**39.** *See id.* at 52.

**40.** *Id.*

**41.** *Ahearne Opinion, id.* at 54.

**42.** *Bradford Opinion, id.* at 57.

**43.** *Id.* at 57 n.4.

**44.** *Id.* at 57.

**45.** *See id.* at 59.

the licenses. He did not address the NEPA issue.

## II. PRELIMINARY DISCUSSION

### A. *The Issues*

The Commission's decision in this case, as we have seen, was a determination that it could not, or should not, evaluate health, safety and environmental impacts associated with the Westinghouse export applications (a) on the Philippines, or (b) on the American bases and personnel located nearby the Philippines reactor site.

Petitioners first contend that the Commission's review of these matters, so circumscribed, resulted in a meaningless NRC finding that the export of the Westinghouse reactor to the Philippines would not be inimical to the "common defense and security" of the United States or to the "health and safety of the public." This hollow finding of *non-inimicality*, petitioners allege, violates the Commission's legal obligations under the amended Atomic Energy Act.[46] A nuclear accident befalling a United States reactor in the Philippines, say the petitioners, would undermine national defense interests generally by shaking world confidence in the United States and the confidence of our allies, and more specifically, by jeopardizing the viability of the military forces near the reactor site. Thus petitioners would claim the Commission is obligated to demonstrate *wholly independently from the executive's statutory submissions and representations* that operation of the reactor in the light of hypothetical events in the Philippines will not be "inimical" to this country's strategic interests.

Respondents counter that "common defense and security" is a congressional construct relating to nonproliferation, and that "[w]hile health and safety impacts might, in extraordinary cases, affect the common defense and security, the Commission *may defer to the determination of the Executive Branch* that such impacts do not warrant denial of the license."[47]

The second major issue on appeal here is the Commission's decision not to prepare a site-specific environmental impact statement because of its understanding that NEPA does not apply to impacts in a foreign country as occasioned by the federally licensed export of a nuclear reactor to the Philippines. Subsidiary environmental questions involve the Commission's reliance on programmatic and generic environmental analyses with respect to impacts on the global commons as well as the territory of the United States. The parties argue, on the one hand, that NEPA applies to the foreign effects of a domestic licensing decision, and on the other, that the NEPA prescription—the procedural requirement of an environmental impact statement "to the fullest extent possible"—is limited more narrowly to major federal actions occurring within, or having effects upon, the United States itself. This dispute, of course, is a legal question entirely. Construing the equivocal reach of NEPA abroad, however, is a judicial endeavor oft-encountered, but not yet fully realized by any court. We, too, will face this issue tentatively.

The two issues invoke the separate standards of two different statutes. Nevertheless, there is plainly some analogy between the statutory issues—each questions whether there is the duty that an independent agency of the United States explore consequences in a foreign land, consequences in which the foreign government is also interested, and, moreover, whether that agency then must be influenced in its own decision-making by the results of the exploration of foreign consequences. I shall attempt a concise synthesis of the overlapping problems before moving on to analyze what is required of the Commission under each statute separately.

### B. *Examining Foreign Impacts in General*

The export licensing of nuclear reactors takes place, of course, at NRC headquarters inside the United States. One must there-

---

46. 42 U.S.C. § 2133(d) (1976).

47. Brief for Respondent, United States of America at 13b (emphasis added).

fore examine the following proposed characterization: that the Commission's extension of health, safety and environmental review to the foreign impacts of nuclear exports (a) constitutes an extraterritorial application of United States law, and/or (b) implicates the foreign relations of the United States and impairs its conduct by the President.

1. How could consideration by the NRC, in a domestic decisionmaking context, of health, safety and environmental impacts in the Philippines "constitute[ ] an exercise of American sovereign power within the area of the foreign country's territorial sovereignty"?[48]

The export of any commodity across national boundaries calls into play, and sometimes into conflict, the national interests of the exporter-country and the importer-country. Where nuclear power programs and the sale or purchase of nuclear reactors are involved, the public policy of each country, the exporting jurisdiction and the importing jurisdiction, is scrupulously engaged. One country wants both to promote its own nuclear industry and to effect its plan for restraining the proliferation of nuclear weapons and weapons potential. The other country wants to plan the national development of an electric power network.[49] Neither country wants the plant to blow up—but each for its own different reasons. The distant United States has its "common defense and security" and international reputation on the line. Generalized humanitarian concerns are also prominent. But the Philippines is interested in actually providing power, and safety. Thus the legiti-

mate regulatory jurisdictions of the two countries overlap, but are not the same. In fact, the Philippines, as *amicus curiae*, portends the danger in transnational regulatory conflict:

> If the United States followed a policy of imposing its own regulatory procedures and standards on all host countries involved in advanced technology trade with the United States, such a policy would undoubtedly bode ill for the ability of the United States to maintain military facilities in as many locations around the world as it now does.
>
> Most importantly, the Republic believes that an examination of impacts on United States citizens residing in the Philippines should not be used as a disguised way of substituting United States regulatory standards for the Republic's own.[50]

This is not a case of the United States imperiously imposing its will on the Philippines. Nevertheless, conditioning export licenses on the satisfaction of standards fashioned in the United States may unnecessarily displace domestic regulation by the government of the Philippines.

I do not disagree with petitioners' note that "the extraterritoriality principle governs the construction of statutes which are sought to be applied in a manner which proscribes *or prescribes* activity in the sovereign territory of a foreign country,"[51] and would therefore be inapposite where "the regulated conduct occurs within the United States." That note, however, conveys only half the story. Conditioning an export license on the health, safety and environmental standards we think sound

---

**48.** *FTC v. Compagnie de Saint-Gobain-Pont-à-Mousson*, 636 F.2d 1300 at 1305–1306 (D.C.Cir. 1980) (considering narrow question of FTC's authority to serve investigatory subpoenas upon foreign citizens by registered mail). In *Compagnie de Saint-Gobain* we reasoned at some length about what extraterritorial effect was properly imputed to congressional statutes consistent with accepted jurisdictional principles of international law. *See generally id.* at 1314–1318. We said in *Compagnie de Saint-Gobain* that "our recognition of [foreign] sensibilities must affect our willingness to infer congressional authorization for a particular mode of [foreign] service from an otherwise silent statute." *Id.* at 1304.

**49.** *See generally* Philippines *Amicus* Brief, *supra* note 9. The Philippines' National Power Corporation (NPC) owns, operates and coordinates 90 percent of all Philippines electrical generating capacity (including the proposed Napot Point reactor). *Id.* at 5. All generating facilities under NPC were nationalized under Presidential Decree No. 40 in November 1972. *Id.* at 8.

**50.** *Id.* at 23. *See also* note 49 *supra* and accompanying text.

**51.** Petitioners' Brief at 45 n.1 (emphasis added). *But cf. id.* at 45 n.2.

for the foreign nation's regulation directs that nation's choices just about as effectively as a law whose explicit purpose is to compel foreign behavior. In short, failure to perceive extraterritorial consequence in the course petitioners propose for the NRC would be naive.

Regulatory coercion across national borders is plainly a possibility for the United States when we hold the cards. But when a foreign development program—the public provision of electricity—is at stake, we should not assign an insignificant place to the foreign political interest. Some balancing, or recognition of latent conflict of laws, would seem judicious to reconcile the separate *but not inconsistent* national interests to regulate reactors with an eye to health, safety and the environment.[52] As this court said in a recent case about the Federal Trade Commission's authority to serve investigatory subpoenas in France,

> [t]he exercise of jurisdiction by any governmental body in the United States is subject to limitations reflecting principles of international and constitutional law, as well as the strictures of the particular statute governing that body's conduct.[53]

But whatever the wisdom of restraining the extraterritorial grasp of this country in order to align ourselves with principles of international law, it would shrink before an unequivocal mandate from Congress.[54] Where a statute directs an agency of the United States to consider foreign environmental impacts no court of the United States will contravene the will of Congress. The only exception would be if the legislature were wholly without jurisdiction to prescribe the relevant conduct: this would occur only if that conduct occurred outside the territory of the United States, had—or was intended to have—no effects within the United States, or involved no conduct of nationals of the United States.[55] This is not such a case. The Congress most assuredly may prescribe conduct relating to the grant or denial of a license authorizing the export of a nuclear reactor from the United States.[56]

Here, however, the Congressional mandate is vague. We ought somehow to accommodate the two separate national regulatory interests with the "extraterritoriality principle." We do honor to the sovereignty of national governments, our own included, when we respect foreign public policy by not automatically displacing theirs with ours. This calls for a thorough understanding of our interests as defined by Congress—we can then reasonably balance the scope of our own regulation alongside the rightful regulatory jurisdiction of the Philippines. I will undertake this specific investigation in Parts III and IV below.

2. Do the actions of the NRC affect the foreign relations of the United States?

After the immediately preceding discussion, it cannot be gainsaid that NRC decisionmaking touches on matters germane to foreign public policymakers. Technical

---

52. *See, e. g.*, Note, *Extraterritorial Application of the Anti-trust Laws: A Conflict of Laws Approach*, 70 Yale L.J. 259, 272–87 (1960) (arguing in favor of some deference to foreign public policy by United States courts) ("The continuing expansion of regulatory legislation and of government participation in national economies will require courts explicitly to weigh competing governmental interests in an increasing number of cases involving areas other than antitrust." *Id.* at 286–87.) *See also* Almond, *The Extraterritorial Reach of United States Regulatory Authority Over the Environmental Impacts of Its Activities*, 44 Alb.L.Rev. 739 (1980).

53. *FTC v. Compagnie de Saint-Gobain-Pont-à-Mousson*, at 1315 (D.C.Cir.1980).

54. *See* Restatement (Second) of Foreign Relations Law of the United States § 38 (1965); *FTC v. Compagnie de Saint-Gobain-Pont-à-Mousson*, at 1323 (D.C.Cir.1980). *See also Foley Bros. Inc. v. Filardo*, 336 U.S. 281, 285, 69 S.Ct. 575, 577, 93 L.Ed. 680 (1949) ("The canon of construction which teaches that legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States ... is a valid approach whereby unexpressed congressional intent may be ascertained.")

55. *See* Restatement (Second) of Foreign Relations Law of the United States §§ 17, 18, 30 (1965).

56. *See generally* 42 U.S.C. § 2014(b) (1976).

NRC decisions will confront equally technical, *but also political*, decisions of the President (and executive branch), and foreign leaders. If the Commission's health, safety and environmental review of foreign impacts were to impede or challenge the development of foreign nuclear energy programs, it would, in turn, inhibit the conduct of United States foreign relations.

Under the Atomic Energy Act the Commission must make judgments that the future behavior of foreign governments will not be inimical to this country's "common defense and security," and also, that proposed exports fall under applicable bilateral or multilateral agreements for cooperation.[57] It is difficult to imagine how the licensing acts of NRC affecting the United States role as a nuclear supplier could escape association with our foreign relations goals. This is true *a fortiori* in the NNPA context of suppressing the international spread of nuclear weapons potential by replacing it with predictable, formalized export licensing. The Senate Committee Report on NNPA declared the bill's purpose as one of "promot[ing] our nonproliferation policies by establishing a more effective framework for international cooperation to meet the energy needs of all nations and ensure that the worldwide development of peaceful nuclear activities—including nuclear commerce—does not contribute to proliferation...."[58]

Plainly, the Commission simply by deliberating on nuclear export questions will influence the denouement of United States foreign relations in a particularly sensitive arena: that of controlling proliferation of nuclear materials among nations. It is equally plain, however, that the Commission's statutory role *requires* the agency's entry into the field of foreign affairs, within certain limits. Those limits are principally defined in the amended Atomic Energy Act (and, broadly speaking, in the Constitution, of course) by the President's dominion over foreign affairs.[59] NNPA specifically provides that the President may overrule an NRC decision, and order authorization of the nuclear export license.[60] Responsibility thus rests finally in the executive branch to ensure achievement of the nation's foreign policy goal to defeat nuclear proliferation. The Commission's task is complementary. I will explore below whether or to what extent, extraterritorial health, safety and environmental review by the Commission comports with the statutory framework, or whether, it risks unduly impeding the conduct of United States foreign relations.

## C. *Legal Standard of Review*

The issues on appeal before this court are questions of law. This court must interpret statutory terms like "common defense and security" and "health and safety of the public," among others. Likewise, the extension of NEPA to foreign impacts requires traditional (albeit somewhat problematic) statutory construction and analysis. The Administrative Procedure Act requires the reviewing court to "decide all relevant questions of law."[61] Though a court will grant some deference to the Commission's interpretations of the statute it must administer, the expertise of the judiciary is in

---

57. *See generally* Bettauer, *The Nuclear Non-Proliferation Act of 1978*, 10 Law & Pol'y in Int'l Bus. 1105 (1978).

58. S.Rep.No.95–467, 95th Cong., 1st Sess. 3 (1977), U.S.Code Cong. & Admin.News 1978, 326, 328, *reprinted in* Congressional Research Service (CRS) Legislative History of NNPA at 459.

59. *See United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304, 319, 57 S.Ct. 216, 220, 81 L.Ed. 255 (1936).

60. 42 U.S.C. § 2155(b)(2) (Supp. II 1978). Congress may then override the President's decision by a concurrent resolution. *Id.* Though President Carter, who on 10 March 1978 signed

H.R.8638 which became Public Law 95–242, expressed his doubts about congressional invalidation by concurrent resolution, the constitutionality of these provisions has not been conclusively resolved. *Cf. Chadha v. Immigration and Naturalization Service*, 634 F.2d 408 (9th Cir. 1980) (holding unconstitutional, as a violation of separation of powers, one-house congressional veto of decision of Attorney General and INS to allow alien to remain in United States).

61. 5 U.S.C. § 706 (1976). "[A]gency action, findings, and conclusions" "not in accordance with law" must be set aside. *Id.* § 706(2)(A).

statutory analysis and must be applied when appropriate.[62] We do not face here any factual or technical determinations reached by the Commission. Rather, issues of agency jurisdiction and legal obligation are at stake. We should reject respondents' proposition that this case is governed by the "arbitrary and capricious" standard.[63] The term "substantial evidence" is also immaterial where the issues turn on the legal basis, not the factual underpinning, of the agency's action.

## III.  THE ATOMIC ENERGY ACT AS AMENDED BY NNPA

We have seen earlier that Congress was competent to impose such restrictions or conditions as it pleased on our trade in nuclear exports.[64] Nuances of foreign sovereignty and foreign policy will color our statutory analysis where there are interstices in the Act, but the Act's criteria for nuclear export licensing must be directly confronted and construed. The question, simply put, is whether Congress required the NRC to consider health and safety impacts *in the foreign environment around the site of the exported reactor.* In this regard the Act stipulates only that the Commission may not grant an export license should it find that the export would be inimical to the "common defense and security" of the United States, or inimical to the "health and safety of the public." [65]

I find that this statutory language and legislative history are inconclusive and *do not obligate* the Commission to evaluate foreign health, safety and environmental impacts to find "non-inimicality." The Commission may defer to the executive on these matters. I also find that the Commission' *is not precluded* from considering foreign health, safety and environmental impacts, and under "unusual circumstances" may deny an export license on that basis. The Commission, moreover, has the discretion to consider possible effects exported nuclear reactors may have on United States interests located near the site of the exported reactor. However, where the Commission may act on a discretionary basis, it must take care to avoid *ad hoc* decisionmaking that could jeopardize the administrative consistency contemplated by Congress.

### A.  *Congressional Purpose*

By adding NNPA on top of the existing Atomic Energy Act Congress confirmed its intention that assurances of *nonproliferation* and maintenance of the *military balance* be the indispensable conditions of United States nuclear exporting.[66] Con-

---

**62.**  *See Barlow v. Collins*, 397 U.S. 159, 166, 90 S.Ct. 832, 837, 25 L.Ed.2d 192 (1970).

**63.**  *See* NRC Brief at 37; Brief for Respondent, United States America at 32.  *See also* Brief for Intervenor at 76.  Judge Robinson and I agree in the necessary result here, but we differ somewhat in this respect.  I believe that this appeal poses questions of law—the NRC's jurisdiction and statutory duties—and therefore is *necessarily* decided by judicial construction of the two statutes and not by simple deference to the agency's interpretation.

**64.**  *See* Parts II A. & B. *supra.*

**65.**  42 U.S.C. § 2133(d) (1976).  *See* note 14 *supra* for complete statutory text.

**66.**  *See* NNPA §§ 2–3, 22 U.S.C. §§ 3201–02 (Supp. II 1978); S.Rep.No.95–467, 95th Cong., 1st Sess. 2–3 (1977) [hereinafter Senate Report];  H.R.Rep.No.95–587, 95th Cong., 1st Sess. 8–9 (1977) [hereinafter House Report].

Note that NNPA policies are distinct from domestic nuclear regulatory policies.  "[NNPA] does not affect our domestic nuclear power programs."  House Report at 7.  The NRC has different priorities with respect to its regulation of *export* licensing as compared with its *domestic* licensing and regulating of nuclear materials.  Judge Robinson would appear to assimilate export licensing procedures to domestic licensing and regulating procedures.  *Cf.* Judge Robinson's opinion at notes 80–84.  In the export context the NRC is charged with ensuring that technical *nonproliferation* criteria are satisfied.  In other words, in the export arena "safety" implies the containment of nuclear weapons potential.  In the domestic context, on the other hand, the NRC is charged with ensuring the safe *operation* of nuclear power plants throughout the United States.  As far as original Atomic Energy Act purposes go, consider:

Almost any cooperation with any foreign country can be said to involve some risk to the common defense and security of the United States.  The provisions ... are designed to permit cooperation where, upon weighing those risks [of proliferation] in the light of the safeguards provided, there is found to be

gress established mechanisms of export control designed to constrain nuclear importers from acquiring nuclear weapons capability. NNPA amendments added rigorous, more comprehensive substantive and procedural criteria for nuclear exports; under the unamended Atomic Energy Act the standard for granting an export license had been no more elaborate than the criterion of "common defense and security." [67] The NNPA nonproliferation standards introduced safeguards providing that nuclear exports be used only for peaceful (nonexplosive) purposes.[68]

But apart from specific safeguards, Congress recognized that its hopes for worldwide forbearance from nuclear *weapons* capability depended on the satisfaction of (seemingly irrepressible) world demand for nuclear *generating* capability. The United States, by virtue of its leading position in nuclear technology, can satisfy prospective foreign consumers of nuclear power. A predictable, reliable supplier might obviate the nascent urges of non-nuclear-weapons countries to develop their own *unchecked* channel of nuclear supply. This was the "carrot" approach towards influence with other nations. In the words of the House Committee Report:

> This legislation recognizes that the best way to control proliferation, however, is *not through unilateral strictures*, but rather through policies that provide *incentives* strong enough to attract the adherence of other countries to our antiproliferation aims....
>
> The legislation would *assure* nations which share our antiproliferation goals a *reliable source* of fuel for nuclear light water reactor[s].... These provisions have the effect of diminishing the need for technologies, such as conventional reprocessing, that lead to quick weapons capability.
>
> The bill seeks to provide a *clear and understandable set of standards and export criteria* to replace the loose and in-.consistent [past] policies ....[69]

The floor manager of the bill in the House, Congressman Bingham, said that NNPA was intended in part to remedy prior "uncertainty as to what the U.S. nuclear export standards are" by "establish[ing] consistent and effective criteria for the licensing of all U.S. exports and ... procedures for prompt consideration of export applications [to] enhance our position as a reliable supplier of nuclear fuel to nations which share our antiproliferation policies." [70] It is apparent that Congress wished the creation of a relatively formal and finite system for regulating exports [71] rather than a more tentative *ad hoc* approach.[72] To this end, Congress outlined

> no unreasonable risk to the common defense and security.
>
> . . . . .
>
> S.Rep.No.83–1699, 83rd Cong., 2d Sess. 22 (1954), U.S.Code Cong. & Admin.News 1954, pp. 3456, 3477.

**67.** *See* House Report at 21:
These amendments [to the Atomic Energy Act] provide consistent and effective antiproliferation criteria to be applied to all U.S. nuclear exports. They provide, for the first time since the inception of the Atoms For Peace Program in the 1950's, explicit standards which will govern U.S. nuclear export activities.

**68.** As a party to the Treaty on the Non-Proliferation of Nuclear Weapons, art. III(2), 21 U.S.T. 483, T.I.A.S. No. 6839, 729 U.N.T.S. 161 (entered into force 5 March 1970), the United States may not provide significant nuclear materials to non-nuclear-weapons states without requiring that International Atomic Energy Agency (IAEA) safeguards be applied. *See* 42 U.S.C. § 2157(a)(1) (Supp. II 1978) (NNPA

herein implements IAEA safeguards requirement).

**69.** House Report at 7 (emphasis added).

**70.** 123 Cong.Rec. H9831 (daily ed. 22 Sept. 1977), *reprinted in* CRS Legislative History of NNPA at 873–74.

**71.** NRC export findings were intended "to be based solely on the required findings, and not on any other unrelated or administratively established requirement." 124 Cong.Rec. S2445–53 (daily ed. 27 Feb. 1978), *reprinted in* CRS Legislative History of NNPA at 608 (remarks of Senator McClure) (discussing amendment to S. 897 he sponsored and which had been adopted 2 February 1978, 124 Cong.Rec. S1055–1102 (daily ed.)).

**72.** "This [legislation] is an important step designed to replace the *ad hoc approach* which has too often characterized past executive branch actions in the antiproliferation area." House Report at 7 (emphasis added).

strict statutory time limits in NNPA to standardize and expedite the administrative licensing process.

The congressional focus on systematic criteria undercuts the suggestion that Congress intended NRC decisionmaking to reach out to inscrutable, or remote considerations. Evidently, Congress insisted on categorical, but yet modest export controls whose application could be accepted not unenthusiastically by likeminded foreign nations. The desire to see opportunities for proliferation quashed resulted in a *mitigation* of "unilateral strictures." [73] NNPA was intended to win fellow adherents to our philosophy of nonproliferation. NNPA promises cooperation, not confrontation, so long as the principle of peaceful exploitation of nuclear power is vindicated by the recipient nation. This understanding of the statute discourages inviting an administrative review likely to trench on foreign sensibilities. [74] The foreigners' conviction that they themselves are competent to regulate their own environment is not to be lightly rejected. To do so could thwart the overall purpose of the legislation. [75]

## B. Environmental Protection Standards

### 1. Statutes.

The provisions of the Atomic Energy Act and NNPA do not stipulate environmental criteria or guidelines. [76] Rather, after extended debate on the Senate floor, [77] a compromise provision was inserted—the compromise agreement would reflect some concern for environmental protection, but was not to affect interpretation of NEPA one way or another. [78]

The terms of the amendment called on the President to "endeavor to provide," in any new or modified bi- or multilateral agreement "for cooperation between the parties in protecting the international environment from radioactive, chemical or thermal contamination arising from peaceful nuclear activities." [79] Existing agreements

---

**73.** *See* notes 69–72 *supra* and accompanying text.

I reject petitioners' argument that this "predictability" interpretation of NNPA is refuted by "language ... which places compliance with these criteria on equal footing with 'any other applicable statutory requirements' or 'other requirements of law.'" Reply Brief at 5. This broad language cannot be relied on to defeat the manifest congressional interest in proposing that the United States be the world's routine and regular supplier of nuclear exports (pursuant to the requirements of this law, of course).

**74.** *See* note 69 *supra* and accompanying text.

**75.** *See* 124 Cong.Rec. S1429–68 (daily ed. 7 Feb. 1978), *reprinted in* CRS Legislative History of NNPA at 704 (remarks of Sen. McClure) (recognizing that NNPA's safeguards guidelines tread on "very, very sensitive matters within foreign countries, upon which foreign countries must, as a matter of their own security and their own pride, be able to run their own affairs, without direct interference by foreign countries, and they are going to resist to some degree dictation from a foreign country, even the United States."). In the words of one commentator:

The interrelation between the competing objectives of cooperation and control is, to say the least, delicate. Nations perceive stable access to sources of energy as a vital national security objective; cooperation that does not derive from a monopoly position will succeed only so long as the recipient considers its supplier to be reliable. Even at the cost of substantial diseconomies, nations may feel driven to develop their own indigenous nuclear fuel cycles to avoid both what they consider unpredictable supply conditions and *supplier controls intrusive on their national sovereignty.*

Bettauer, *The Nuclear Non-Proliferation Act of 1978*, 10 Law & Pol'y in Int'l Bus. 1105, 1106 (1978) (emphasis added).

**76.** Whether the "non-inimicality" criteria assimilate environmental, or site-specific health and safety factors will be addressed in the next section. *See* Part III. C. *infra.*

**77.** *See* 124 Cong.Rec. S1449–54 (daily ed. 7 Feb. 1978) (debate on S. 897); *see also id.* at S1069–72, S1079–83 (daily ed. 2 Feb. 1978).

**78.** The Senators consciously intended that their debate and legislation on NNPA not supersede or prejudge eventual interpretation of whether NEPA requires environmental impact statements for United States activities having effects wholly within foreign jurisdictions. *See* 124 Cong.Rec. S1449–50 (daily ed. 7 Feb. 1978) (remarks of Sen. Glenn and Sen. McClure), *reprinted in* CRS Legislative History of NNPA at 725. *See also* Bettauer, *The Nuclear Non-Proliferation Act of 1978*, 10 Law & Pol'y in Int'l Bus. 1105, 1161–63 & n.335 (1978).

**79.** 42 U.S.C. § 2153e (Supp. II 1978).

for cooperation, including those with the Philippines, do not contain such environmental provisions.[80] *Thus, there is no explicit mandate in NNPA, or pursuant to NNPA, which requires administrative review of environmental factors in the recipient country.*

### 2. Precedents.

The Commission has consistently declined to number foreign environmental, health or safety impacts among its export licensing considerations.[81] Similarly, in this case the Commission has concluded that it should not engage in an examination of such impacts.

The Commission's consistent legal interpretation is relevant here, because Congress has required that the agency keep that body fully and currently informed of nuclear export licensing practices.[82] This court has

earlier noted the sensitive relationship between the Atomic Energy Commission (predecessor to the NRC) and the Congress.[83] If anything, the extensive congressional oversight of nuclear export activities in force prior to NNPA has been *increased* under NNPA.[84] Given Congress' special efforts to scrutinize nuclear export actions, the failure of Congress to correct consistent NRC interpretation is probative of likely congressional approval.[85] Also, Congress has plainly cast consistency in NRC licensing as an independent virtue in itself.[86] For these reasons, and since we know that Congress in other contexts has provided explicitly for administrative review of health and safety factors encompassing foreign impacts,[87] some weight to the Commission's historic view that NNPA is without plenary reference to foreign environmental factors is in order.

---

80. *See* Bettauer, *The Nuclear Non-Proliferation Act of 1978*, 10 Law & Pol'y in Int'l Bus. 1105, 1161 (1978). The several "Agreements for Cooperation" between the Philippines and the United States do not specify environmental programs. *See generally* Philippines *Amicus* Brief. The omission of an environmental provision in these agreements does not require a waiver of that point by the President. Such leeway "recognize[d] ... the sensitivity that some other foreign countries may attach to including a provision on environmental protection in nuclear cooperation agreements ...." Bettauer, *supra*, at 1162. In fact, even the "compromise" provision in NNPA, 42 U.S.C. § 2153e (Supp. II 1978), refers to the "international" environment and not to the domestic environment of the importing nation. Solicitude for particular foreign *domestic* environments is distinguishable from bilateral concern for the shared "international" environment, and is consequently difficult to ascribe to NNPA.

81. *See, e. g., Edlow International Company*, 5 N.R.C. 1358 (1977) (export to India); *Babcock and Wilcox*, 5 N.R.C. 1332 (1977) (export to federal Republic of Germany); *Westinghouse Electric Corporation*, 3 N.R.C. 739 (1976) (export to Spain); *Edlow International Company*, 3 N.R.C. 563 (1976) (export to India). These NRC decisions also unanimously conform to the proposition that NEPA does not apply to foreign impacts. *See also* 41 Fed.Reg. 56,895 (30 Dec. 1976).

82. 22 U.S.C. § 3282(c) (Supp. II 1978). The NRC decisions cited in note 81 *supra*, were decided prior to—and figured in—the enact-

ment of NNPA. Congress had been informed of these decisions pursuant to 42 U.S.C. § 2259 (1976). This information was noted during Senate floor debates. *See, e. g.*, 124 Cong.Rec. S1449, S1453 (daily ed. 7 Feb. 1978).

83. *See Union of Concerned Scientists v. AEC*, 499 F.2d 1069, 1079 (D.C.Cir.1974) (quoting *Siegel v. AEC*, 400 F.2d 778 (D.C.Cir.1968)).

84. *See* 42 U.S.C. § 2155(b)(2) (Supp. II 1978); note 11 *supra* and accompanying text. *See also* Bettauer, *The Nuclear Non-Proliferation Act of 1978*, 10 Law & Pol'y in Int'l Bus. 1105, 1176–78 (1978).

85. *See Kay v. FCC*, 443 F.2d 638, 646–47 (D.C. Cir.1970).

86. *See* House Report at 5; notes 69–73 *supra* and accompanying text.

87. *E.g.*, Federal Hazardous Substances Act, 15 U.S.C. § 1273 (Supp. II 1978); Flammable Fabrics Act, 15 U.S.C. § 1202 (Supp. II 1978); Consumer Product Safety Act, 15 U.S.C. § 2067 (Supp. II 1978). These amendments provided that the Consumer Products Safety Commission could ban exports of products deemed dangerous to American consumers.

Also, in a related context, the House voted 266–106 to defeat an amendment (H.R.12157) requiring the Export-Import Bank to analyze foreign nuclear regulatory impacts before authorizing reactor loans. *See* 124 Cong.Rec. H7432–39 (daily ed. 27 July 1978).

## C. "Non-Inimicality"

The conclusions of the preceding section necessarily suggest that the Commission has appropriately declined to consider foreign impacts. We need to determine more precisely, however, the meaning of section 103(d) of the Atomic Energy Act,[88] the Act's general holdover criterion which survived the NNPA's addition of specific nonproliferation criteria. The relevant provision reads: "[N]o license may be issued . . . if, in the opinion of the Commission, the issuance of a license . . . would be inimical to the common defense and security or to the health and safety of the public."

### 1. Not inimical to the "common defense and security."

[I]n the absence of *unusual circumstances*, the committee believes that any proposed export meeting the [nonproliferation safeguards] criteria set forth in subsection 127a. and, . . . subsection 128a., *would also satisfy the common defense and security standard.*[89]

I read the statement by the House Committee quoted above as establishing that, as a general rule, the Commission need not look beyond the nonproliferation safeguards in determining whether the common defense and security standard is met. "Unusual circumstances" requiring inquiry beyond the nonproliferation criteria cannot have reference to *the American bases in the Philippines.* That is hardly an unusual circumstance. We also have bases—*and reactors* —of which we can suppose Congress was not unaware, in Spain, Germany, etc.[90] And seismic activity, like American troops, tourists and business interests, is also ubiquitous about the globe. The seismological attributes of Napot Point have not escaped

the Commission, the executive, or the Philippines—I am prepared to defer to the NRC's finding that long extant volcanoes and past and future earthquakes in the Philippines do not rise to the level of "unusual circumstance"[91] as far as our own nation's "common defense and security" is concerned.[92]

a. *Policy considerations.* I have already discussed the congressional purpose and viewpoints at some length.[93] It was evident that Congress eschewed unilateral measures in favor of a provision stating that "[t]he President shall endeavor" to negotiate bilateral or multilateral agreements "for cooperation between the parties in protecting the international environment."[94] The best inference I can draw from these manifestations of congressional purpose (like the availability of nuclear equipment and supplies from the United States *to make nonproliferation attractive,* and the reliance on cooperative efforts ministering to shared environmental concerns) is that Congress would not have obligated the NRC to study *foreign impacts ultimately within foreign control.* NRC consideration of these impacts conceivably might mire nuclear export licensing in plain contravention of the NNPA objectives: expedition and predictability. Prolonged consideration by NRC would challenge the very administrative implementation of NNPA.

Moreover, safety and local environmental impact would turn substantially on the ongoing operation and management of the foreign reactor (albeit one imported from the United States)[95]—factors beyond the Commission's ken. Surely, by tendering comprehensive safety data and assistance as it is solicited,[96] the Commission would satisfy whatever are its statutory duties beyond

---

88. 42 U.S.C. § 2133(d) (1976).

89. House Report at 21 (emphasis added).

90. *See, e. g.,* notes 81–82 *supra* (citing NRC decisions, known to Congress, of approved exports to countries also harboring U.S. troops).

91. The NRC may not reject, to a fault, any and all posited "unusual circumstances." Such categorical repudiation would likely constitute an abuse of discretion which a court would refuse to uphold.

92. *See NRC Decision,* J.A. at 24, 34.

93. *See* Part III. A. *supra.*

94. 42 U.S.C. § 2153e (Supp. II 1978). *See* note 80 *supra* and accompanying text.

95. *See* notes 34, 38–39 *supra* and accompanying text.

96. *See* notes 36–37 *supra* and accompanying text.

the nonproliferation criteria. Congress has clearly intended that the Commission not make nuclear export licensing so arduous that we lose our foreign customers to other suppliers, and hence lose our chance to export the built-in nuclear standards of our products.

b. *Reliance on the executive.* The President has the last word on nuclear exports.[97] The President is also responsible for the conduct of foreign relations [98] as well as being the Commander-in-Chief. These considerations militate against the hypothesis that the NRC is obliged to decide whether impacts on the Philippines, or on American armed service members stationed there, are inimical to the "common defense and security." Prejudicial impacts on that country or our armed forces would without doubt jeopardize our country's strategic or tactical military posture. However, these are judgments the executive—the President, and Departments of State and Defense—is best equipped to make. These actors are all closely involved in the export licensing process. Their representations to the NRC on matters of national security are entitled to deference. Furthermore, among the representations and submissions prepared by the executive is a concise environmental review [99] of local, site-specific impacts.[100] Given the manifold bilateral treaties and agreements between the two governments, it would be presumptious for the Commission to weigh the safety of the Philippines and the soldiers there on a "common defense and security" scale without expert sensitivity to foreign policy repercussions.

The executive has fully reviewed and determined that the export to the Philippines is not inimical to our "common defense and security." [101] I find that the Commission has properly and sufficiently relied on the executive's foreign policy, extraterritorial and national security conclusions.[102] To be sure, in deliberating over nuclear export licensing the Commission serves well as an independent, expert check on the executive's parallel technical findings. But should the Commission duplicate the executive's strategic judgments, it risks impairing them.[103]

2. Not inimical to the "health and safety of the public."

The current of the logical analysis brought to bear on "common defense and security" above flows in the same direction now for the "health and safety of the public." In addition, I turn finally to the "presumption against extraterritoriality" to uphold the Commission's decision that the public health and safety standard obligates it to consider only the American public within the United States.

I have discussed above [104] how United States laws will not be applied extraterritorially unless the mandate to do so is unequivocal. This proposition is most sound here, where the legislative perception expressly incorporated notions of blending the national interests of other countries with our own. There is a problem in achieving the American ideal of nonproliferation which is unattainable without likeminded decisions by the rest of the world. Congress' solution is to encourage foreign decisionmaking in one particular direction. Thus the NNPA theme is to gain global influence in a world-wide struggle to constrain the spread of nuclear weapons. To gain converts to the nonproliferation ideal, rather than antagonize our sovereign equals, Congress made the United States

---

97. *See* Part I. A. *supra.*

98. *See* Part II. B. 2. *supra.*

99. *See* Concise Environmental Review—Philippines Nuclear Power Plant Unit 1 (1979), *reprinted in* J.A. at 415 *et seq.*

100. *See* Exec.Order No. 12,114, 44 Fed.Reg. 1957 (9 Jan. 1979); notes 16, 23–24 *supra* and accompanying text.

101. *See* Part I. B. *supra.*

102. Because the statute is not explicit we decline to hold that the NRC is utterly without discretion to consider factors of this nature within its "common defense and security" review.

103. *See* 124 Cong.Rec. S2447, S2451–52 (daily ed. 27 Feb. 1978) (remarks of Sen. McClure). *See also* Bettauer, *The Nuclear Non-Proliferation Act of 1978,* 10 Law & Pol'y in Int'l Bus. 1105, 1116 (1978).

104. *See* Part II. B. *supra.*

into a nuclear supplier at the world's disposal, to the extent that reciprocal acceptance of our ideal is promised. Simply put, the congressional commitment to nuclear reliability entailed a diminished capacity of the United States to be quirky or exclusive with its exports.[105]

So, then, the rule against extraterritoriality is applied here to justify the Commission's refusal to assimilate the American public in America to American armed forces in the Philippines (or in the many other places around the globe where the United States has military personnel). The premise that the Philippines is sensitive to foreign regulatory forays inside its borders seems fair,[106] as does the postulate that *on balance* the Philippines sovereign interest [107] may prevail over and displace the NRC administrative interest.[108]

**105.** NNPA strives toward the goal of nuclear safety for all humanity, a "global good," as it were. Domestic regulatory interests in securities, or antitrust law, from which petitioners argue by analogy, pertain only to our national conception of the good. Petitioners cite, *e. g.*, *Leasco Data Proc. Equip. Corp. v. Maxwell*, 468 F.2d 1326 (2d Cir. 1972); *United States v. Alcoa*, 148 F.2d 416 (2d Cir. 1945). In these two cases domestic regulation was held to apply if and only if a transgression abroad had domestic effects. Extraterritorial scope is essential to ensure effectiveness in the domestic regulation of securities and anti-trust practices. NNPA violations, however, do not affect the domestic system for nuclear energy in a similar way. Indeed, the evil of global nuclear proliferation is not capable of remedy within any one national system. Reflecting this reality, NNPA proposes, in effect, a transnational order promoting peaceful nuclear energy in exchange for promises and conditions of nuclear weapons nonproliferation. The NNPA structure is thus fundamentally different from the legal structures for domestic economic control that are applicable to securities or antitrust. So whereas foreign violations of our securities laws must be cognizable in order to preserve the integrity of domestic securities markets, foreign deviations from our nuclear regulatory standards neither affect nor threaten us in the same immediate way. This difference favors a certain modesty on the part of United States nuclear regulators regarding foreign impacts which are basically someone else's problem.

**106.** *See generally* Philippines *Amicus* Brief.

**107.** This enunciation of the principle borrows much from the international concept of "comity," *see* I. Brownlie, Principles of Public Inter-

## IV. NEPA REQUIREMENT AS TO EXTRATERRITORIAL IMPACTS

The Commission evaluated possible health, safety and environmental effects of the Philippines reactor upon United States territory and the global commons before deciding to grant the export application.[109] After evaluating the concise environmental review provided by the executive and other environmental documents,[110] the Commission concluded the domestic and global effects were not significant.[111] I do not find this assessment unreasonable, or in violation of NEPA, which requires:

> that, to the fullest extent possible: (1) the policies, regulations, and public laws of the United States shall be interpreted and administered in accordance with the policies set forth in this chapter, and (2)

national Law 31 (3d ed. 1979), and from the judicial "act of state" doctrine, *see, e. g., Timberlane Lumber Co. v. Bank of America*, 549 F.2d 597 (9th Cir. 1976).

**108.** It is possible to try to make something out of the Senate Committee's selection of the word "overseas" on one occasion. The report says:

> Although the NRC finding on the health and safety of the public refers only to the American public, it should be recognized that certain *overseas* activities could pose a threat to Americans.

Senate Report at 13 (emphasis added).

The argument could be that the Senate was not referring to domestic public health considerations of reactor exports to contiguous Canada or Mexico, but rather that the phrase is more sensibly juggled to mean health considerations for Americans located overseas. And as I noted earlier, Americans work or sojourn in most places on the globe. Possible reactor shipments to the nearby but not contiguous Bahamian islands aside, I regard this passage as addressing nuclear exports overseas whose impacts might be diverse enough to reach back into the basic home of Americans, the territorial United States. That hypothetical is not this case. *See* notes 31–33 *supra* and accompanying text.

**109.** *See NRC Decision*, J.A. at 39–45; notes 29, 31–33 *supra* and accompanying text.

**110.** *See* notes 16, 23–25, 30 *supra* and accompanying text.

**111.** *See NRC Decision*, J.A. at 45.

all agencies of the Federal Government shall—

\* \* \* \* \* \*

(C) include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official . . . .[112]

The material NEPA issue on appeal is whether the federal decision to export a reactor, causing no significant American or global impacts, nevertheless triggers the requirement of a site-specific environmental impact statement, solely because of effects occurring in a foreign jurisdiction. In other words, must the NRC take cognizance of Philippine impacts in an environmental impact statement (EIS)?

Since the Commission prepared no EIS, one must go beyond the issue of strict compliance[113] to decide whether NEPA applies at all in this situation. My reluctance to apply NEPA extraterritorially is animated by the same anti-extraterritorial policy arguments and understandings adumbrated in the NNPA analysis. I also note that the NEPA jurisprudence indicates that exclusively foreign impacts do not automatically invoke the statute's environmental obligations.[114] I find only that NEPA does not apply to NRC nuclear export licensing deci-

sions—and not necessarily that the EIS requirement is inapplicable to some other kind of major federal action abroad.

Here, the foreign policy qualification provided by Congress *in NEPA itself* engages the policy rationales so critical to NNPA. Given the agenda for transnational order implicit in the nonproliferation statutes, one must give force to the NEPA imperative to

(F) recognize the worldwide and long-range character of environmental problems and, *where consistent with the foreign policy of the United States*, lend appropriate support to initiatives, resolutions, and programs designed to maximize international cooperation in anticipating and preventing a decline in the quality of mankind's world environment . . . .[115]

This NEPA prescription, I find, looks toward cooperation, not unilateral action, in a manner consistent with our foreign policy.[116] Moreover, if an EIS requirement attached to nuclear exports, there would be the spectre of litigation over the adequacy of the EIS, with delay the inevitable result. Unilateral EIS review thus appears incongruous in the nuclear exports/nuclear nonproliferation context.

A. *Legislative History*

The United States Congress can outline national goals for Americans only.[117]

---

**112.** 42 U.S.C. § 4332(2)(C) (1976) (NEPA, § 102(2)(C)).

The purposes of [NEPA] are: To declare a *national policy* which will encourage productive and enjoyable harmony between man and his environment; to promote efforts which will prevent or eliminate damage to the *environment and biosphere* and stimulate the health and welfare of man; to enrich the understanding of the ecological systems and natural resources important to *the Nation*; and to establish a Council on Environmental Quality.

*Id.* § 4321 (emphasis added).

**113.** Though the petitioners propose that perhaps more modest, "special" environmental procedures might apply extraterritorially, *see* Reply Brief at 2, thereby mitigating NEPA's mandate, one must decide whether the NRC can authorize this nuclear export without subscribing to NEPA's procedural dictates, given that the only significant impacts here occur in the Philippines.

**114.** *See generally* Almond, *The Extraterritorial Reach of United States Regulatory Authority Over the Environmental Impacts of Its Activities*, 44 Alb.L.Rev. 739 (1980); Krauland, *NEPA, Nukes, and Non-Proliferation: Clarifying the Transnational Impact Statement Mandate in Nuclear Export Licensing*, 4 Hastings Int'l & Comp.L.Rev.——(1981) (forthcoming).

**115.** 42 U.S.C. § 4332(2)(F) (1976) (NEPA, § 102(2)(F)).

**116.** *See NRDC v. Export-Import Bank*, No. 77–0080 (D.D.C. 10 Mar. 1978) (trial court entered order staying EIS action pending executive foreign environmental review in light of foreign policy ramifications).

**117.** *See* 42 U.S.C. § 4331(a) (1976) ("requirements of present and future generations of Americans").

NEPA thus reflects the perception of a global problem from the American perspective, and offers a procedural remedy to assist in a solution for Americans. There is, of course, the likelihood that other cultures, other countries at diverse stages of development, will react in their own way to the same global problem. Did Congress mean for NEPA to address environmental concerns for those countries too?

In an earlier section [118] we have seen that, when the NNPA Congress turned to environmental protection, it focused on international cooperation and left open the issue of extraterritorial application of NEPA. The intention of the NEPA Congress, however, is obscure. All we can know for sure is that the earlier Congress also recognized the merits of *cooperation* and *foreign policy* temperance.[119] The parties refer us to various pre- and post-enactment hearings held before congressional subcommittees pondering NEPA issues. They are inconclusive; I must conclude that NEPA's legislative history illuminates nothing in regard to extraterritorial application.

### B. *Judicial Precedents*

A district court for the District of Columbia has recently stated that "[t]he extraterritoriality of NEPA remains an open question in this Circuit." [120] It was correct. There are a number of cases, however, which do address the application of NEPA beyond United States borders. These cases are both factually distinguishable *and* missing the foreign policy element. To be assured that NEPA has not been *de jure* extended "overseas," I examine a number of those cases.

In *Wilderness Society v. Morton* [121] our court considered whether nonresident Cana-

dian citizens could intervene in an action challenging the adequacy of an EIS prepared for the proposed TransAlaska pipeline. The court permitted the Canadian intervention, noting briefly (in a two page *per curiam* opinion) that possible oil spills in or around Canada distinguished the intervenors' environmental advocacy from that of the existing parties coming from adjacent America. The court based its *ratio decidendi* on a "mere recitation of appellants' contentions, plus a look at the map," which made "it quite clear that the interests of the United States and Canadian environmental groups are sufficiently antagonistic in this litigation to require granting of the application for intervention." [122]

The case at bar is of course not an intervention case dealing only with a procedural question. The petitioners here advocate environmental concerns expressing Philippine interests. If anything, the direction of the foreign antagonism runs against the petitioners themselves, who from non-adjacent America presume that they can represent the Philippine environment. Another difference is that *Wilderness Society* posed "no problem with regard to separation of powers or interference with the conduct of foreign relations in the narrow questions presented here." [123] *Wilderness* does not address at all the substantive issue whether NEPA extends to a foreign environment. It is entirely silent on the question before us, whether an EIS must be prepared for a project with no environmental impact within the United States. A significant substantive difference between our case and *Wilderness Society* was the ongoing control exercised by the United States with respect to the pipeline. In the Philippines nuclear export, on the other hand, United States

---

118. *See* note 115 *supra* and accompanying text.

119. *See* notes 115–16 *supra* and accompanying text.

120. *National Org. for Reform of Marijuana Laws (NORML) v. United States*, 452 F.Supp. 1226, 1232 (D.D.C.1978), *appeal dismissed*, No. 78–1669 (D.C.Cir. 24 April 1979). In that case itself the court *assumed* that NEPA required an EIS, because the "[d]efendants do not contest that there is an impact in this country . . . ." *Id.*

The *NORML* court based its conclusion about the state of the law in the Circuit on *Sierra Club v. Adams*, 578 F.2d 389, 392 n.14 (D.C.Cir. 1978) (*assumes* NEPA applicable to federal construction in Panama; "resolution of this important issue [left] to another day").

121. 463 F.2d 1261 (D.C.Cir.1972) (per curiam).

122. *Id.* at 1262–63 (citation omitted).

123. *Id.* at 1263 (Tamm, J., concurring).

responsibility is limited within the confines of a licensing decision.

In *People of Enewetak v. Laird* [124] the district court for Hawaii found NEPA applicable to the *United States trust territories* in the Pacific. The court noted the foreign policy caveat in section 102(2)(F) [125] and said: "In areas like the Trust Territories there is little, if any, need for concern about conflicts with United States foreign policy or the balance of world power." [126] In our case the Commission has conceded that trust territories fall under its obligatory jurisdiction. [127] This decision declining to apply NEPA to an independent country is completely consistent with *People of Enewetak*. [128]

After a district court decision requiring an EIS for federal highway construction in Panama and Colombia, [129] this court in *Sierra Club v. Adams* [130] reversed the trial court's finding that the EIS was inadequate. [131] The *Sierra Club* court did not decide the NEPA extraterritoriality issue, because the government in that case "never questioned the applicability of NEPA to the construction of this highway in Panama." [132] The facts in *Sierra Club* reveal that the United States had two-thirds of the ongoing financial responsibility and control over the South American highway construction. Moreover, the EIS requirement had been originally triggered by health effects on United States livestock herds. [133] The highway was viewed as significantly threatening to open a potential line of transmission of "foot-and-mouth" disease from Colombia, where it is epidemic, to

cattle in this country. Road construction was feared as possibly disrupting the existing effective natural land barrier to the disease. Plainly, *Sierra Club* environmental considerations were of a different nature from those we face in this case with respect to the Philippines.

## V. CONCLUSION

For the foregoing reasons I would uphold the Commission's grant of nuclear export license applications XR–120 and XCOM–0013 to Westinghouse for shipment to the Philippines.

*So ordered.*

SPOTTSWOOD W. ROBINSON, III, Circuit Judge, concurring in the judgment.

Seldom if ever has an administrative agency been assigned a mission so important to the well-being and survival of mankind as that entrusted by Congress to the Nuclear Regulatory Commission (NRC). Recent events have sharpened our awareness that growing reliance on nuclear power has brought not simply the blessings of technological progress, but also the ever-present spectre of nuclear accident, the escalating peril of nuclear weapons proliferation, and the potential for devastating effects on the fragile environment of our planet. Concomitantly, however, the universal search for alternatives to fossil fuels has prompted many nations, both industrial and developing, to look more and more to

**124.** 353 F.Supp. 811 (D. Hawaii 1973).

**125.** 42 U.S.C. § 4332(2)(F) (1976).

**126.** *Enewetak v. Laird*, 353 F.Supp. at 818. The court explicitly did not decide the question of extraterritorial application of NEPA into territories within the jurisdiction of some other country. *Id.* at 817 n.10.

**127.** *See* note 8 *supra* and accompanying text.

**128.** There are also numerous other cases where courts have been able to avoid the extraterritorial NEPA issue. For example, in *Sierra Club v. AEC*, 4 Env.L.Rep. 20,685 (D.D.C.1974), the Atomic Energy Commission (whose function was later assumed by the Energy Research and Development Administration (ERDA)), *see* note

30 *supra*, voluntarily agreed to provide a worldwide programmatic EIS for United States nuclear exporting.

**129.** *Sierra Club v. Coleman I*, 405 F.Supp. 53 (D.D.C.1975).

**130.** 578 F.2d 389 (D.C.Cir.1978).

**131.** *Sierra Club v. Coleman II*, 421 F.Supp. 63 (D.D.C.1976).

**132.** 578 F.2d at 391–92 n.14 (quoting government brief).

**133.** *See id.* at 394.

nuclear energy as a key source of power, at least for the foreseeable future.

In an effort to contain this evolving conflict between human need and danger, Congress began in 1946 to set up defined procedures governing the domestic use of nuclear power and the export of peaceful nuclear technology to foreign nations.[1] NRC is the central figure in the administration of the various legislative schemes that have followed over the years,[2] and among NRC's many statutory responsibilities is the licensing of critical nuclear reactor components for export. It is NRC's response to this fateful duty—imposed by the Nuclear Nonproliferation Act of 1978 (NNPA)[3] in conjunction with the Atomic Energy Act of 1954 (AEA)[4]—that is the target of this litigation. I join Judge Wilkey in affirming the agency action under review, but because my reasoning for so doing differs substantially from his, I write separately to explain my rationale.

### I. INTRODUCTION

Specifically at stake here is NRC's divided decision to approve the export of critical components for Philippines Nuclear Power Plant–1 (PNPP–1),[5] the first commercial nuclear generating station to be erected in the Philippine Islands.[6] Although in any NNPA licensing proceeding the President may overrule NRC's determination should it withhold a license or find itself unable to make the findings required by statute,[7] the significance of NRC's role cannot be overemphasized. At the heart of the statutory scheme lie the mandate to NRC "to provide a strong, independent check" on the judgment of the Executive Branch,[8] and Congress' reservation to itself of the power to reinstate NRC's decision if it considers the President's justification unconvincing in light of NRC's own findings.[9] Thus NRC bears a weighty responsibility in keeping the world safe from the potential hazards of nuclear power.[10]

1. Atomic Energy (McMahon) Act of 1946, 60 Stat. 755 (1946), as amended by Atomic Energy Act of 1954, 68 Stat. 921 (1954), as amended, 42 U.S.C. §§ 2011 *et seq.* (1976) [hereinafter cited as codified].

2. NRC is the successor to the old Atomic Energy Commission (AEC). See note 60 *infra.*

3. Publ.L.No. 92–242, § 2, 92 Stat. 120 (1978), 22 U.S.C. §§ 3201 *et seq.* (Supp. II 1978) [hereinafter cited as codified].

4. 68 Stat. 921 (1954), 42 U.S.C. §§ 2011 *et seq.* (1976), as amended by NNPA, Pub.L.No. 95–242, § 2, 92 Stat. 120 (1978). NNPA was enacted in 1978 as an amendment to AEA.

5. There are two NRC orders under review here: *Westinghouse Elec. Corp.,* CLI–80–14, 11 N.R.C.—(May 6, 1980), Joint Appendix (J.App.) 1, and *Westinghouse Elec. Corp.,* CLI–80–15, 11 N.R.C.—(May 6, 1980), J.App. 3 [hereinafter cited as *Jurisdictional Decision*]. The content of each is discussed in Judge Wilkey's opinion, text at notes 5–8. The second order was accompanied by four separate opinions, the plurality opinion of Commissioners Kennedy and Hendrie, along with that of Commissioner Gilinsky comprised the majority; Commissioner Bradford and Commissioner Ahearne dissented, each providing a statement of his reasons. For a summary of the nature of each opinion, see Wilkey Opinion (Wilkey Op.), text at notes 18–44.

6. See Brief for Petitioners at 14. That country's only prior experience with nuclear power was limited to a small research reactor installed at the Philippines Atomic Research Center. *Id.*

7. See 42 U.S.C. §§ 2155–2157 (Supp. II 1978). The statutory scheme of the Nuclear Nonproliferation Act is discussed in text *infra* at notes 47–54.

8. 124 Cong.Rec. S1067 (daily ed. Feb. 2, 1978) (remarks of Senator Glenn), Congressional Research Service Legislative History of the Nuclear Nonproliferation Act of 1978, at 775 [hereinafter cited as CRS Legislative History]. See also *id.* at S1464 (remarks of Senator Percy), CRS Legislative History, *supra,* at 745 (daily ed. Feb. 7, 1978) ("NRC, in making the findings and judgments required under this act, should independently assess the information which is available to it."); *id.* at S1333 (remarks of Senator Glenn), CRS Legislative History, *supra,* at 676; H.R.Rep.No.587, 95th Cong., 1st Sess. 21 (1977) [hereinafter cited as House Report].

9. NNPA § 128, 42 U.S.C. § 2157 (Supp. II 1978). See notes 52–54 *infra* and accompanying text. The text of § 128 is reproduced in full in the Wilkey Op., n.13.

10. See Part II *infra* for discussion of NRC's role under NNPA.

The majority of NRC's commissioners interpreted their statutory responsibilities so as to minimize the extent to which the agency must employ its technological expertise in the course of the licensing process.[11] In the rulings we uphold today, NRC authorized the export of critical PNPP–1 components with virtually no technical review of the potential health, safety, and environmental impacts from the reactor that ultimately will be constructed.[12] This is troubling to me, not only because of the awesome risks inseparably accompanying any nuclear power plant, but also because this reactor will be built and operated by a country almost totally without prior experience with nuclear energy,[13] and will be sited in the shadow of four volcanoes[14] in a known earthquake zone.[15] Despite the command of Section 103(d) of NNPA to refuse an export license when it would be "inimical to the common defense and security or to the health and safety of the public,"[16] NRC has concluded that it can fulfill that obligation by drawing on but little of its technological expertise in the course of the licensing process.

Whatever the wisdom and even the validity of the course NRC has pursued, this court has little choice but to affirm it. The relevant legislative texts and histories are devoid of clear guidance on the issues presented in this case. Even were we able to come to a more definitive resolution of the meaning of the statutes involved, we could not upset the action under review. Courts must yield great deference to an interpretation of a statute by the agency entrusted with its administration.[17] "Particularly is this respect due when the administrative practice at stake 'involves a contemporaneous construction of a statute by the men charged with the responsibility of setting its machinery in motion, of making the parts work efficiently and smoothly while they are yet untried and new.' "[18] Moreover, "[t]o sustain the [agency's] application of [the] statutory term[s], we need not find that its construction is the only reasonable one, or even that it is the result we would have reached had the question arisen in the first instance in judicial proceedings."[19] Rather, our call as judges is

---

11. Only Commissioner Bradford was concerned that the law required of NRC more work than it had done. See *Jurisdictional Decision, supra* note 5, dissenting opinion of Commissioner Bradford at 9, J.App. 63.

12. I do not mean to undervalue the work that NRC has done under the auspices of cooperative programs with the Philippines. See *Jurisdictional Decision, supra* note 5, at 41–42, J.App. 45–46. NRC is to be commended for its participation in these joint efforts. Nevertheless, such programs do not relieve my fears about NRC's interpretation of its statutory responsibilities with respect to the export licensing process.

13. See note 6 *supra*.

14. PNPP–1 is to be located on a flank of Mt. Natib, about five miles away, and within ninety miles of three other volcanoes. Brief for Petitioners at 10. Petitioners point out that "[a] 1978 IAEA [International Atomic Energy Administration] expert mission to the Philippines stated that the PNPP–1 site is 'unique to the industry insofar as the risk associated with nearby volcanoes is concerned' and concluded that the 'eruption of Mt. Natib is a credible event which should be taken into account in design.' " Brief for Petitioners at 10–11 (footnote omitted), quoting Report of the IAEA Safety Mission for a Review of Certain Geological and Geotechnical Aspects of the Site and Its

Environment for the PNPP–1, at 7 July 1978), NRCA/R Vol. 12, Doc. 11 [hereinafter cited as IAEA 1978 Safety Report].

15. The 1978 IAEA Mission concluded that the danger of earthquakes to PNPP–1 merited further investigation and analysis. IAEA 1978 Safety Report, *supra* note 11, n.1 at 3–6, 4.

16. 42 U.S.C. § 2133(d) (1976).

17. See, e. g., *Griggs v. Duke Power Co.*, 401 U.S. 424, 433–434, 91 S.Ct. 849, 854–855, 28 L.Ed.2d 158, 165 (1971); *United States v. City of Chicago*, 400 U.S. 8, 10, 91 S.Ct. 18, 20, 27 L.Ed.2d 9, 12–13 (1970); *Udall v. Tallman*, 380 U.S. 1, 4, 85 S.Ct. 792, 795, 13 L.Ed.2d 616, 619 (1965).

18. *Power Reactor Dev. Co. v. Electrical Workers Int'l Union*, 367 U.S. 396, 408, 81 S.Ct. 1529, 1535, 6 L.Ed.2d 924, 932 (1961), quoting *Norwegian Nitrogen Prods. Co. v. United States*, 288 U.S. 294, 315, 53 S.Ct. 350, 358, 77 L.Ed. 796, 807 (1933), in turn quoted in *Udall v. Tallman, supra* note 17, 380 U.S. at 16, 85 S.Ct. at 801, 13 L.Ed.2d at 625.

19. *Unemployment Compensation Comm'n v. Aragon*, 329 U.S. 143, 153, 67 S.Ct. 245, 250, 91 L.Ed. 136, 145 (1946), quoted in *Udall v. Tallman, supra* note 17, 380 U.S. at 16, 85 S.Ct. at 801, 13 L.Ed.2d at 625.

to honor the "venerable principle that the construction of a statute by those charged with its execution should be followed unless there are compelling indications that it is wrong...." [20]

I am led to concurrence in affirmance essentially by force of these teachings. My view is that NRC's interpretation of its statutory responsibilities must prevail simply because there is insufficient cause to overturn it judicially, and that is my principal difference with Judge Wilkey. I cannot subscribe to decisional grounds that go beyond affirmance on grounds of deference and read the statutes as NRC has done, or to his views with respect to the foreign policy considerations bearing on the questions at issue in this litigation. After highlighting the relevant legislative history of NNPA,[21] I shall explain more fully how we deviate, first on the NNPA–AEA questions presented [22] and then on the NEPA issues.[23]

## II. THE LEGISLATIVE HISTORY OF NNPA

NNPA was enacted in 1978 as a comprehensive amendment of AEA with respect to the regulation and control of the export of nuclear reactors and critical nuclear reactor components. In drafting NNPA, the overriding objective of Congress was to take measures to stem the tide of nuclear weapons proliferation. As the House Report on one of the bills that formed the basis for

NNPA [24] elaborately explains, the new legislation was intended to

> mark[ ] a new and important phase in the history of U.S. policy on the civil use of atomic energy. After the first nuclear weapons were dropped on Hiroshima and Nagasaki American policymakers clung, understandably enough, to the hope that atomic secrets and materials could be withheld from the rest of the world. Eventually, the United States began to contemplate sharing nuclear items essential to the production of electrical power; but even this limited sharing was proposed originally under policies that were uncompromising in their insistence on provisions capable of providing a significant degree of security and protection.

\* \* \* \* \* \*

With the advent in 1954 of the Atoms for Peace program, the United States undertook to liberalize its policy and openly to promote the civil use of atomic energy. Research reactors were disseminated widely and became, after a time, a kind of new international status symbol. Nuclear power projects were initiated, sometimes irrespective of need and economic feasibility, in scores of countries around the world. And foreign nationals began to receive training in the U.S. in all branches of nuclear technology. As American nuclear sharing grew, standards and safeguards criteria became

**20.** *Red Lion Broadcasting Co. v. FCC*, 395 U.S. 367, 381, 89 S.Ct. 1794, 1802, 23 L.Ed.2d 371, 384 (1969) (footnote omitted). Accord, *New York Dep't of Social Serv. v. Dublino*, 413 U.S. 405, 421, 93 S.Ct. 2507, 2516–2517, 37 L.Ed.2d 688, 699 (1973); *Columbia Broadcasting Sys. v. Democratic Nat'l Comm.*, 412 U.S. 94, 121, 93 S.Ct. 2080, 2096, 36 L.Ed.2d 772, 794 (1973). This is a canon of statutory construction commanded by the Supreme Court; it is not "simple deference to the agency's interpretation." Wilkey Op., note 63.

An additional reason for deference to NRC here is that the agency is required to keep Congress fully informed of its policies. 22 U.S.C. § 3282 (Supp. II 1978), and NRC's decision in the instant licensing proceeding is based on consistent policies developed over the last several years that Congress has not seen fit to alter. See *Kay v. FCC*, 143 U.S.App.D.C. 223, 231–232, 443 F.2d 638, 646–647 (1970). See, e.

g., *Edlow Int'l Co.*, 5 N.R.C. 1358 (1977); *Babcock and Wilcox*, 5 N.R.C. 1332 (1977); *Westinghouse Elec. Corp.*, 3 N.R.C. 739 (1976). But see *Chisholm v. FCC*, 176 U.S.App.D.C. 1, 538 F.2d 349, cert. denied, 429 U.S. 890, 97 S.Ct. 247, 50 L.Ed.2d 173 (1976) (congressional silence in the face of consistent administrative interpretation is not always dispositive).

**21.** Part II *infra*.

**22.** Part III *infra*.

**23.** Part IV *infra*.

**24.** Six committee reports were prepared in connection with NNPA. See CRS Legislative History, *supra* note 8, at 413. The two most pertinent to this discussion are House Report, *supra* note 8, and S.Rep.No.467, 95th Cong., 1st Sess. (1977), CRS Legislative History, *supra* note 8, at 457 [hereinafter cited as Senate Report].

more diffuse, and important inconsistencies of policy began to arise. The United States continued, for example, to prohibit the export of reprocessing facilities because of the weapons grade material such facilities inevitably produced. Yet export was permitted for certain reactor fuels that were themselves already suitable for immediate use in nuclear explosives. By the middle of the 1960's, the consequences of such looseness became increasingly apparent.

With the implementation of the Treaty on the Non-Proliferation of Nuclear Weapons (NPT),[25] a new and somewhat more ambiguous phase of atomic history began. The proliferation problem was elevated to position of prominence, but efforts at achieving greater control were incomplete and sometimes even dubious in value. In the NPT itself, nuclear weapon States pledged to share the benefits of nuclear power to those countries which vowed not to develop a nuclear weapon. Unfortunately, the nuclear sharing provision came to be used by some as a justification for the spread of technologies that were not only economically quite marginal, but they tended as well to erode the distinction between nuclear weapon and non-nuclear weapon States.

The detonation of a nuclear explosion by India in the spring of 1974 shattered the tranquility of the early 1970's and led to nonproliferation initiatives of considerable breadth and vigor....[26]

As the report later recounts, the United States began an intensive process of reassessing its nuclear export policies following the nuclear explosion in India.[27] Several Senate and House committees and subcommittees held hearings in order to identify the problems[28] and to formulate potential solutions. The end product was the enactment of NNPA in 1978; the purpose of the new legislation was

to establish new and more rigorous criteria and procedures to govern the export of nuclear material and technology by the United States .... The approach to the legislation [was] to provide both incentives for foreign nations to conform to comprehensive antiproliferation safeguards, and deterrents to attainment of technologies and materials which would enable other nations to produce nuclear explosives in a short time.[29]

NNPA, then, was intended to balance measures designed to make the standards governing United States' nuclear exports more reliable and consistent and the process of reviewing export license applications more predictable, while providing safeguards against the danger that the export program would intensify the risk of nuclear weapons proliferation as had the unfocused ad hoc policies of the mid-1960's.[30] Con-

25. Treaty on the Non-Proliferation of Nuclear Weapons, art. III(a), 21 U.S.T. 483, T.I.A.S. No. 6839, 729 U.N.T.S. (entered into force Mar. 5, 1970).

26. House Report, *supra* note 8, at 2–3, CRS Legislative History, *supra* note 8, at 415–416.

27. *Id.* at 416–417.

28. See House Report, *supra* note 8, at 4, CRS Legislative History, *supra* note 8, at 417. Among those identified were: variable controls, absence of standards, narrowness of focus, and ambiguity of policy. *Id.*

29. *Id.* at 1, CRS Legislative History, *supra* note 8, at 414.

30. See text *supra* at note 26. In short, the new process
      would establish consistent and effective criteria for the licensing of all U.S. nuclear exports and arrangements subsequent to agree-

ments. [It would] also close[ ] loopholes in existing law to apply these criteria to all exports which are to be used in nuclear facilities. In addition, procedures for prompt consideration of export applications would be provided to enhance our position as a reliable supplier of nuclear fuel to nations which share our antiproliferation policies.

123 Cong.Rec. 30294 (1977) (remarks of Representative Bingham), CRS Legislative History, *supra* note 8, at 874. See also House Report, *supra* note 8, at 6, J.App. 419; 124 Cong.Rec. S1336 (daily ed. Feb. 7, 1978) (remarks of Senator Percy), CRS Legislative History, *supra* note 8, at 681; *id.* (remarks of Senator Byrd), CRS Legislative History, *supra* note 8, at 691; 125 Cong.Rec. 30295 (1977) (remarks of Representative Zablocki), CRS Legislative History, *supra* note 8, at 876.

gress also emphasized the need for expeditious processing of nuclear export license applications, because it was felt that excessive time lags would cause potential purchasers to turn to other suppliers, foiling the goals of NNPA.[31]

In addition to the congressional concern with nonproliferation, other objectives also emerge from a study of the legislative history. Principal among these was the desire to enable American businesses and consequently the American economy to reap the benefits of sales of nuclear reactors and reactor components. According to Senator McClure, speaking with reference to the lull in nuclear reactor sales by American companies in the preceding two years,

> [a] significant element in the foreign competition has been a marked decline in the creditability of the United States as a reliable supplier, because [of] inordinate delays in obtaining licenses for nuclear exports, a lack of new enrichment service capacity, delays in the formulation of U.S. nonproliferation policy, and increasingly competitive positions by foreign vendors, whose business capacity was

predicated on the basis of continuing export sales.[32]

Senator McClure went on to say, that "[t]he dramatic impact[ ] . . . of domestic employment and balance of payments cannot lightly be dismissed in the policy considerations associated with [NNPA]."[33] A related view was that the market share of American corporations was inextricably intertwined not only with the American economy, but also with the ability of the United States to achieve its nonproliferation goals, since influence furthering these objectives could be extended only if the United States continued to export nuclear technology.[34]

Another subject prominent in the NNPA debates and reports was the environment. The thoughts articulated were of two types: a few legislators were troubled by the delay that could be caused by requiring an environmental impact statement (EIS) for reactor exports,[35] while others wanted to be sure that environmental consequences of exported reactors and components would be taken into account.[36] The fears of those who opposed application of NEPA's require-

31. According to Senator Glenn:
[T]he procedures in this bill are designed to allow licenses to proceed in timely fashion and the intent is not to use these procedures to hold up licenses for 6 months, or 8 months, or as long as a year, which sometimes has happened, and which probably, has done more to stifle U.S. initiative abroad in the nuclear industry, and discourage prospective buyers of American products, than anything else we have had in our industry. *Id.* at S1433 (daily ed. Feb. 7, 1978) (remarks of Senator Glenn), CRS Legislative History, *supra* note 8, at 698. See also, *e. g., id.* (remarks of Senator Percy); *id.* at S1434 (remarks of Senator McClure), CRS Legislative History, *supra* note 8, at 707.

32. Additional Statement of Senator James A. McClure, Senate Report, *supra note* 24, at 94, CRS Legislative History, *supra* note 8, at 550. See also, *e. g.,* 124 Cong.Rec. S1070 (daily ed. Feb. 2, 1978) (remarks of Senator McClure), CRS Legislative History, *supra* note 8, at 781; *id.* at S1458 (remarks of Senator Schweiker), CRS Legislative History, *supra* note 8, at 734.

33. *Id.* 124 Cong.Rec. S1093–1094 (daily ed. Feb. 2, 1978) (remarks of Senator Thurmond), CRS Legislative History, *supra* note 8, at 826. But *see id.* at S1068 (remarks of Senator Percy), CRS Legislative History, *supra* note 8, at 777

("[t]he industry must have an understanding attitude that our interest is not just to protect producers; our interest here must be to protect the public interest . . . they will have to recede and subordinate commercial interests . . . .").

34. See, *e. g., id.* at S1432 (daily ed. Feb. 7, 1978) (remarks of Senator McClure), CRS Legislative History, *supra* note 8, at 697; *id.* at S1093–1094 (daily ed. Feb. 2, 1978) (remarks of Senator Thurmond), CRS Legislative History, *supra* note 8, at 826; *id.* at S1316 (daily ed. Feb. 7, 1978) (remarks of Senator Hollings), CRS Legislative History, *supra* note 8, at 645.

35. See, *e. g.,* 124 Cong.Rec. S1079–1083 (daily ed. Feb. 2, 1978) (remarks of Senator Wallop), CRS Legislative History, *supra* note 8, at 798–806; 123 Cong.Rec. 30298 (1977) (remarks of Representative Derwinski), CRS Legislative History, *supra* note 8, at 884.

36. See, *e. g.,* 124 Cong.Rec. S1071 (daily ed. Feb. 7, 1978) (remarks of Senator Glenn), CRS Legislative History, *supra* note 8, at 719; *id.* at S1451 (remarks of Senator Percy), CRS Legislative History, *supra* note 8, at 720–721, 804–805, 123 Cong.Rec. 31360 (1977) (remarks of Representative Bedell), CRS Legislative History, *supra* note 8, at 866.

ments were typified by a statement made by Senator McClure, who worried that

a misinterpretation [of NNPA] could lead to an administrative or judicial requirement for the preparation of environmental impact statements for individual nuclear export applications, specifically taking into account the environmental considerations associated with the ultimate destination for the export in a foreign country.[37]

Senator Wallop analyzed cases involving the extraterritorial application of NEPA in his remarks,[38] voicing the belief that NEPA should not apply to export proceedings.[39] Senator Glenn, however, countered with the observation that NEPA provides "a very broad mandate," whose implementation should be left to the Council on Environmental Quality (CEQ).[40] Similar sentiments were expressed by Senator Percy.[41] Congress ultimately decided that NNPA

would be neutral with respect to the application of NEPA both to the particular problem of nuclear exports and to extraterritorial federal actions in general.[42]

Another set of concerns was addressed to assistance to other countries, and several patterns of thought were again evident. A principal focus centered on devising a reasoned strategy to assist energy-poor countries, particularly members of the Third World, thus ensuring that nuclear power would be offered where appropriate but not foisted off on purchasers unable to employ reactors advantageously.[43] Several legislators worried about potential environmental consequences in purchaser nations,[44] although their views on possible solutions varied.[45] There was also substantial feeling that care should be taken to avoid arousing the resentment of other countries by over-zealous efforts to force compliance with American regulatory standards.[46]

37. 124 Cong.Rec. S1071 (daily ed. Feb. 2, 1978) (remarks of Senator McClure), CRS Legislative History, *supra* note 8, at 783. But Senator McClure also stated: "First and foremost is the welfare of mankind. We have just as much concern about what may happen upon future generations in other countries as we have about what happens here. *Id.* at S1083, CRS Legislative History, *supra* note 8, at 806.

38. *Id.* at S1079–1081 (remarks of Senator Wallop), CRS Legislative History, *supra* note 8, at 798–801.

39. *Id.* Senator Wallop expressed concern that the Council on Environmental Quality (CEQ) would prevail in its efforts to require all federal agencies to prepare environmental assessments of the impacts of major extraterritorial federal actions in recipient countries; he voiced his opposition to such a requirement. See *id.*

40. 114 Cong.Rec. at S1081 (remarks of Senator Glenn) (daily ed. Feb. 2, 1978), CRS Legislative History, *supra* note 8, at 803. Specifically Senator Glenn was responding to Senator Wallop's concern over CEQ's position on preparation of environmental impact statements for major federal actions abroad. He stated that NNPA was not "a proper forum" to clarify the lack of "proper guidance given to what the intent of Congress was as to the Council on Environmental Quality." *Id.*

41. *Id.* at S1082 (remarks of Senator Percy), CRS Legislative History, *supra* note 8, at 804–805.

42. See note 140 *infra* and accompanying text.

43. See, e. g., House Report, *supra* note 8, at 9, CRS Legislative History, *supra* note 8, at 422; Senate Report, *supra* note 24, at 3, CRS Legislative History, *supra* note 8, at 459; 124 Cong. Rec. S1450 (remarks of Senator Glenn), CRS Legislative History, *supra* note 8, at 719; *id.* at S1451 (remarks of Senator Percy), CRS Legislative History, *supra* note 8, at 720–721; 123 Cong.Rec. 31360 (1977) (remarks of Representative Long), CRS Legislative History, *supra* note 8, at 867–868.

44. See, e. g., 124 Cong.Rec. S1450 (daily ed. Feb. 7, 1978) (remarks of Senator Glenn), CRS Legislative History, *supra* note 8, at 719 (referring to "environmentally acceptable" development of nuclear and nonnuclear international environment); *id.* at S1454 (remarks of Senator Percy), CRS Legislative History, *supra* note 8, at 726. See also text *supra* at note 80.

45. See, e. g., 124 Cong.Rec. S1449 (daily ed. Feb. 7, 1978) (remarks of Senator McClure), CRS Legislative History, *supra* note 8, at 718; *id.* at S1450 (remarks of Senator Glenn), CRS Legislative History, *supra* note 8, at 719.

46. See, e. g., 124 Cong.Rec. S1091 (daily ed. Feb. 2, 1978) (remarks of Senator Domenici), CRS Legislative History, *supra* note 8, at 822; 123 Cong.Rec. 30297 (1977) (remarks of Representative McCormack), CRS Legislative History, *supra* note 8, at 881.

These, then, were the objectives of Congress in amending AEA by enacting NNPA in 1978. The resulting statutory scheme requires formal participation in export licensing by both NRC and the Executive Branch.[47] In brief, NRC and the Executive Branch are to begin working on license applications concurrently. The Executive is to submit its views on a particular application to NRC within sixty days, unless the Secretary of State determines that the national interest necessitates additional time.[48] If the Executive Branch opposes the license, none will issue.[49] If NRC receives the Executive's recommendation that issuance of the license will not be inimical to the common defense and security, NRC must make an independent determination whether to issue the license on the basis of specific nonproliferation criteria embodied in Sections 127 and 128 [50] of NNPA, and its evaluation whether the export would be inimical to the common defense and security or public health and safety pursuant to Section 103(d).[51] NRC has 120 days to make these findings, unless it elects to invoke statutory provisions authorizing submission of requests for information to the Executive Branch and/or a public comment period, both of which toll the ordinary time limits.[52] If NRC denies the license, the President may still authorize the export if the national interest so requires.[53] Congress, however, may overturn the presidential authorization in any of the above contexts within sixty days of the issuance of the executive order granting the license.[54]

In carrying out its functions, NRC is to provide a "strong independent check on executive branch nuclear export decisions." [55] The importance of the independence of NRC in this matter is underscored by comments in both the House and Senate Reports and throughout the debates.[56] The override power given to the President does not undercut the role of NRC; as the House Report explains,

> by providing for the public issuance of the Commission's determination and for congressional review of any Presidential decision to reverse that determination, the independence of the Commission [is] preserved.[57]

Similarly, the Senate Report states:

> It is important to note that any such referral of an unfavorable NRC decision on an export license application to the President will be marked by a public notice of that action, and that any decision by the President to override the NRC will be subject to careful scrutiny in Congress.[58]

The function of NRC was clearly to be based on its technical expertise, and public participation to aid NRC in the exercise of this expertise was considered to be crucial. For example, the House Report emphasizes

> the intent of the committee to guarantee to citizens and public interest groups their right to make their views known during the export licensing process. Too often in the past, U.S. nuclear export

---

47. NNPA §§ 126–128, 42 U.S.C. §§ 2155–2157 (Supp. II 1978).

48. NNPA § 126, 42 U.S.C. § 2155 (Supp. II 1978).

49. *Id.*

50. 42 U.S.C. §§ 2156, 2157 (Supp. II 1978), both of which are reproduced in full in Wilkey Op., n.13.

51. AEA § 103(d), 42 U.S.C. § 2133(d) (1976), reproduced in full in Wilkey Op., n.13. See note 67 *infra.*

52. NNPA § 126, 42 U.S.C. § 2155 (Supp. II 1978). (The time constraints imposed by the statutory scheme are also discussed in Part IV *infra.*)

53. *Id.*

54. NNPA § 128, 42 U.S.C. § 2157 (Supp. II 1978).

55. 124 Cong.Rec. at 7 (daily ed. Feb. 7, 1977) (remarks of Senator Glenn), CRS Legislative History, *supra* note 8, at 775. See note 8 *supra* and accompanying text.

56. See, *e. g.*, sources cited in note 8 *supra.*

57. House Report, *supra* note 8, at 21, CRS Legislative History, *supra* note 8, at 434.

58. Senate Report, *supra* note 24, at 14, U.S. Code Cong. & Admin.News 1978 at 339, CRS Legislative History, *supra* note 8, at 470.

policies have not been subject to public review and comment until after their implementation. Exclusion of public views during the export licensing process invites subsequent recourse to the courts by frustrated participants; this can only undermine our position as a reliable supplier of nuclear materials to those nations which share our antiproliferation policies.[59]

Despite these extensive expressions of congressional concerns, however, the legislative history nowhere precisely defines the phrases "common defense and security" or "public health and safety" contained in Section 103(d) of NNPA. Since the Section 103(d) requirement was initially the only finding NRC's predecessor, the Atomic Energy Commission (AEC),[60] was required to make under AEA, and the inquiry into the legislative history of the 1954 Act and the subsequent amendments unfortunately is of little if any assistance. Although these phrases were used in several provisions of the original AEA and the subsequent amending legislation,[61] they were not defined in any manner helpful to the task at hand.[62]

The principal committee reports on NNPA itself contain only three specific references to "common defense and security" and "public health and safety," while the debates do not appear to have addressed the

meaning of the phrases. Firstly, the Senate Report informs readers that

> [a]lthough the NRC finding on the health and safety of the public refers only to the American public, it should be recognized that certain overseas activities could pose a threat to Americans.[63]

Secondly, the House Report reveals that the findings set forth in Sections 127 and 128 "are in addition to any others required by law."[64] Thirdly, the same passage of the House Report states that in order to issue a license NRC is still required to find

> that a particular export would not be "inimical to the common defense and security." However, in the absence of unusual circumstances, the Committee believes that any proposed export meeting the criteria set forth in subsection 127a and, when it becomes effective, subsection 128a, would also satisfy the common defense and security standard.[65]

### III. NRC's DUTIES UNDER AEA AND NNPA

The issue over compliance with NNPA and AEA centers on the extent of the findings NRC is required to make under Section 103(d) of AEA,[66] which provides in pertinent part that

> no license may be issued to any person within the United States if, in the opinion of the Commission, the issuance of a

---

**59.** *Id.* at 22, CRS Legislative History, *supra* note 8, at 435. See also 124 Cong.Rec. S1438 (daily ed. Feb. 7, 1978) (remarks of Senator Glenn), CRS Legislative History, *supra* note 8, at 708. With respect to the technical role of NRC, see, *e. g.*, House Report, *supra* note 8, CRS Legislative History, *supra* note 8, at 435; 124 Cong.Rec. S1096 (daily ed. Feb. 2, 1978) (remarks of Senator Hart), CRS Legislative History, *supra* note 8, at 830.

**60.** AEC was created by the Atomic Energy Act of 1954, 42 U.S.C. §§ 2011 *et seq.* (1976), as amended by NNPA, 22 U.S.C. §§ 3201 *et seq.* (Supp. II 1978). NRC was created by the Energy Reorganization Act of 1974, Pub.L.No.93–428, tit. II, § 201, 88 Stat. 1242 (1974), 42 U.S.C. § 5841 (1976), to assume the regulatory responsibilities of AEC.

**61.** See, *e. g.*, 42 U.S.C. §§ 2011(a), 2012(a), (d), 2013(c), (d), 2014(g), 2071, 2161, 2162(a), (b), 2164(b), 2302(a) (1976).

**62.** 42 U.S.C. § 2014(g) (1976) defines "common defense and security" as "the common defense and security of the United States." 42 U.S.C. § 2014(bb) (1976) defines "the term 'United States' when used in a geographical sense [to] include[ ] all Territories and possessions of the United States, the Canal Zone and Puerto Rico."

**63.** Senate Report, *supra* note 24, at 13, U.S. Code Cong. & Admin.News 1978 at 338, CRS Legislative History, *supra* note 8, at 469.

**64.** House Report, *supra* note 8, at 21, CRS Legislative History, *supra* note 8, at 434.

**65.** *Id.*

**66.** 42 U.S.C. § 2133(d) (1976).

license to such person would be inimical to the common defense and security or to the health and safety of the public.[67]

In order to fulfill this mandate, NRC conceivably could be required to evaluate the effects of the construction of PNPP–1 on (a) the territorial United States and its residents, (b) the Philippines and its residents, (c) United States interests in the Philippines, and (d) the global commons.[68]

## A. NRC's Decision to Permit the PNPP–1 Component Export

In the decisions under review, NRC interpreted AEA as amended by NNPA to require analysis of the potential effects of the PNPP–1 export license only with respect to the territorial United States,[69] and concluded that assessments in the other categories were discretionary.[70] NRC chose to exercise this discretion only with respect to the global commons, principally because of its perceptions of international law and foreign policy concerns,[71] but also because of its belief that in any event additional evaluations of the proposed reactor's effects on the local environment would be somewhat illusory since the operation and mainte-

nance of PNPP–1—factors beyond NRC's control—will be the principal determinants of the reactor's safety and environmental consequences.[72]

At the outset, several threshhold matters deserve comment. I believe that NRC's notion of extraterritorial application of these statutes is mistaken.[73] As Judge Wilkey points out,[74] the conduct regulated by the licensing process is not extraterritorial in nature; it consists of consideration of the suitability of nuclear reactor components for export, a procedure that takes place entirely within the United States. Moreover, while NRC's attention to international legal principles is praiseworthy, under the American system tenets of international law must give way before positive domestic law.[75] Thus, while statutes are to be interpreted consistently with international law where possible,[76] neither courts nor agencies may adhere to international law if to do so would create any conflict whatsoever with the positive statutory laws of this country.

I also question the force of the foreign policy considerations voiced by NRC and Judge Wilkey, for I believe that both have oversimplified the competing principles and

---

67. *Id.*

68. NRC defines the global commons "to include areas, such as the high seas, Antarctica, and the portions of the atmosphere that are not within the territorial jurisdiction of a single nation state." *Jurisdictional Decision, supra* note 5, at 6 n.15, J.App. 10 n.15. Since "[t]here is no international consensus on defining precisely where the territorial sea of the recipient nation ends and the global commons begin[ ]," NRC employed "the twelve mile zone used by the NRC staff as a rough approximation of the bounds of the territorial sea figure for the purpose of analyzing the proposed Philippine export." *Id.*

69. See *Jurisdictional Decision, supra* note 5, at 5–34, J.App. 9–39. NRC defines "United States" as "the territory of the 50 states, as well as U.S. trust territories and possessions." *Id.* at 35 n.63, J.App. 39 n.63. This is consistent with the AEA definition. See note 62 *supra.*

70. See *Jurisdictional Decision, supra* note 5, at 5–34, J.App. 9–34.

71. See *id.*

72. *Id.* at 23, J.App. 27; *id.,* concurring opinion of Commissioner Gilinsky at 3, J.App. 51.

73. The plurality appears to have assumed that by conducting a review of the effects of PNPP–1, pursuant to NNPA and/or NEPA it would be applying these statutes extraterritorially. See *id.* at 21, J.App. 25.

74. See Wilkey Op., text at note 51.

75. *The Paquete Habana,* 175 U.S. 677, 708, 20 S.Ct. 290, 302, 44 L.Ed. 320, 332 (1900); *Tag v. Rogers,* 105 U.S.App.D.C. 387, 389, 267 F.2d 664, 666, *cert. denied,* 362 U.S. 904, 80 S.Ct. 615, 4 L.Ed. 555 (1960). See also Wilkey Op., text at note 54.

76. "International law is part of our law." *The Paquete Habana, supra* note 75, 175 U.S. at 700, 20 S.Ct. at 299, 44 L.Ed. at 328–329. See also *Banco Nacional de Cuba v. Sabbatino,* 307 F.2d 845, 860 (2d Cir. 1962), *rev'd on other grounds,* 376 U.S. 398, 84 S.Ct. 923, 11 L.Ed.2d 804 (1964). "Until the day of capable international adjudication among countries, the municipal courts must be custodians of the concepts of international law, and they must expound, apply and develop that law whenever they are called upon to do so."

interests involved in this litigation. Judge Wilkey states, for example, that "[i]f anything, the direction of the foreign antagonism runs against the petitioners themselves, who form nonadjacent America presume that they can represent the Philippine environment." [77] It is not simply Americans who have decried NRC's action, however. One of the petitioners, for example, is the Philippine Movement for Environmental Protection, while other Filipino public interest groups participated in the comment phase of the licensing proceeding.[78] Additionally, we are told that PNPP-1 has encountered substantial opposition in the Philippines, which the government there has suppressed.[79] In short, my point is that there are no overriding principles of international relations to guide us in this decision. Concern over possible foreign resentment of American regulatory standards should not be permitted to obscure other considerations. As Senator Pell has pointed out, if anything ever should go wrong with an exported reactor or component, "[t]he voice of many countries would quickly shift to criticism of the United States for permitting a dangerous export with insufficient attention to the risks to public health and safety and to the environment." [80]

I must also take exception to NRC's assertion that its review of the safety features and other technical facets of proposed reactor exports would serve no purpose.[81] By making NRC responsible for the licensing process, Congress indicated its intent to draw upon the agency's scientific expertise.[82] Instead of utilizing it, the NRC plurality devoted most of its energy to a discussion of foreign policy. There is something that strikes me as inherently wrong where, as here, the only extensive technical evaluation of critical nuclear reactor components is undertaken by the State Department rather than NRC.[83] Even though the

**77.** Wilkey Op., text at note 123.

**78.** See *Jurisdictional Decision, supra* note 5, at 37–38, J.App. 41–42.

**79.** See Brief for Petitioners at 15–16. At the time the crucial decisions were made the Philippines were under martial law. The alleged incidents involved such things as intimidation of persons opposing PNPP-1, censorship, and manipulation of public hearings.

**80.** Letter from Senator Claiborne Pell to NRC, Nov. 9, 1979, NRC A/R Vol. 2, Doc. 19, quoted in Brief for Petitioners at 33 n.1.

**81.** See note 72 *supra* and accompanying text.

**82.** See note 59 *supra*.

**83.** The only technical evaluation was the Concise Environmental Review prepared by the Department of State pursuant to Executive Order 12114, 44 Fed.Reg. 1957 (Jan. 4, 1979), which requires federal agencies to assess environmental impacts occurring abroad as a result of major federal actions. "[W]hile based on independent authority," the order is intended to "further[ ] the purpose of the National Environmental Policy Act." *Id.* Although the Department of State must adhere to the order in making its recommendation to NRC, in ruling on export licenses the latter is exempted from compliance by § 2–5(v). *Id.*

In this instance there is considerable concern that the concise EIS is inadequate for NRC's purposes. According to Commissioner Bradford, the "void" in the analyses employed in connection with the review of the PNPP-1 license is not filled by the environmental assessment prepared by the Departments of State and Defense with the assistance of the Department of Energy. That document is little more than a description of the reactor. The Department of Energy was strongly critical of it, and it does not address the possible consequences of a severe accident beyond saying that they would be similar to those to be expected in the U.S. This statement ignores local conditions which are essential to evaluating impacts. In any case, the Commission has declined to consider this document even though the Department of State actually suggested an NRC review of the volcanic and seismic risks posed by the reactor to the military bases and thus to the common defense and security. *Jurisdictional Decision, supra* note 5, dissenting opinion of Commissioner Bradford at 5 n.6, J.App. 59 n.6.

I do not quarrel with Judge Wilkey's assertion that NRC may defer to the Executive Branch on matters of foreign policy, see Wilkey Op., text at notes 97–103, but this does not mean that the agency may abdicate its statutory functions simply because their exercise bears on foreign policy. Rather, NRC should adhere to executive judgments on international relations, but not on technological subjects. It may be appropriate for the Executive Branch to inform NRC, for example, that only a major accident involving PNPP-1 would seriously damage United States relations with the Philippines. It does not make sense for the State Department to conduct the principal technological studies to be used by NRC, and it makes

risks associated with PNPP–1 depend heavily upon its operation and maintenance, and though even a well-designed reactor may malfunction, the problems inherent in a poorly-designed power plant or a flawed component surely cannot be overcome solely by good maintenance. As Commissioner Bradford has pointed out, at least a limited review designed to catch obvious flaws could have been conducted.[84]

## B. *Analysis*

### 1. *Effects on the Territorial United States*

Proceeding now to the substantive issues at hand, I have little trouble affirming NRC's analysis of the potential effects of the PNPP–1 export license on the territorial United States,[85] though for reasons different than those set forth in Judge Wilkey's opinion. First, NRC has acknowledged a duty to evaluate these consequences, and presumably has recognized the environmental, health and defense effects aspects of the problem.[86] The plurality rendered a specific finding that the effects would not be inimical to the common defense or security, or to the public health or safety of the United States or its residents.[87] I do have some concerns about

NRC's methodology in reaching this decision, however, for its analysis of the potential dangers of the reactor—whether operating properly or in the event of various possible malfunctions—appears to be cursory at best.[88] While none of the petitioners has quarreled with NRC's conclusions on potential effects on the territorial United States, NRC will be well advised to take this obligation seriously. I would have serious reservations were the reactor not so far removed from this country and relatively distant from any of its territories or possessions, but perhaps that is why NRC did not say more than it did.[89]

### 2. *Effects on the Philippines*

I have no difficulty in deferring to NRC's ruling that it is not required to undertake a review of the effects of the construction of PNPP–1 on the Philippines or its citizens. The legislative history contains references to assistance to other countries and concern for their inhabitants,[90] but it also has passages evidencing reluctance to undertake actions that could arouse the resentment of recipient governments.[91] Finding no clear indication either way, I bow to NRC's judgment. While the United States should be expected to recognize and honor its responsibilities as a supplier of nuclear reactor components,[92] NRC is certainly correct in

even less sense for NRC to accept the conclusions reached by the Executive Branch without a thorough review of their foundations. NRC must fulfill its role as an independent check on Executive Branch export licensing decisions. See note 8 *supra*.

84. *Jurisdictional Decision, supra* note 5, dissenting opinion of Commissioner Bradford at 3–4 & n.4, J.App. 57–58 & n.4.

85. *Jurisdictional Decision, supra* note 5, at 34–35, 45, J.App. 38–39, 45.

86. See *id.*

87. *Id.* at 34–35, 45, J.App. 38–39, 45.

88. See *Jurisdictional Decision, supra* note 5, at 34, 35–41, J.App. 39, 36–45. For example, NRC readily dismissed comments to the effect that Pacific possessions and territories of the United States could be contaminated by a major accident involving PNPP–1. *Id.* Similarly, NRC dismissed nuclear waste management problems—the Philippines may be located in an area too seismically active for local storage of radioactive waste, see Brief for Petitioners at

14—as a matter which can readily be handled at some later date. *Id.* at 40, J.App. 44.

89. But, even so petitioners and CEQ have pointed out the weaknesses of using generic impact analyses as tools for the evaluation of the potential consequences of the construction of a specific nuclear power plant. See text *infra* at notes 128–135 & note 168 *infra*.

90. See text *supra* at notes 43–45.

91. See text *supra* at note 46.

92. It is not only principles of international law that bear on this case, but also a notion embodied in our legal tradition that a vendor is responsible at least to some extent for the quality of its wares. See *Jurisdictional Decision, supra* note 5, dissenting opinion of Commissioner Bradford at 3, J.App. 57. Nuclear reactors are undoubtedly dangerous products, and while the United States is not strictly the merchant of PNPP–1, it is only with United States approval that Westinghouse can export the critical reactor components. All too often the developed world has been accused by the Third World of

saying that Congress has not issued any plain mandate to NRC to safeguard the environment or even the citizens of recipient countries.[93] This may seem unfortunate in that however well-trained their personnel or good their proposed regulatory programs, the expertise and experience of many of those countries does not even begin to approach that of NRC.[94] But petitioners have cited no legal basis sufficient to support an invariable duty on NRC to make a finding as to the effects on a purchaser country and its citizens. Particular situations may be such as to demand an assessment of that kind, but I agree that identification of the occasions appropriate therefor is within NRC's discretion absent a clear indication to the contrary in the legislative history.

### 3. *Effects on United States Interests Abroad*

The most difficult questions arising in this litigation are those concerning the extent of NRC's obligation to evaluate American interests in the Philippines and the global commons. In both of these instances NRC has determined to do a minimum of work in its area of expertise, and that is hardly the most commendable outcome one can envision. But, notwithstanding the silence of Congress, at least the agency has struggled with difficult problems and has achieved some resolution. I move on to closer analyses of these issues in turn.

It will be recalled that in revamping the critical nuclear component export licensing process through enactment of NNPA, Congress was seeking primarily to further the goals of nonproliferation[95] and secondly to enable American industry to increase its share of the world nuclear technology market.[96] Both objectives were tempered by concern over environmental consequences[97] and a desire to assist countries in need of new energy sources.[98] NNPA was fashioned to achieve these goals by making nuclear reactor and component purchases from United States companies attractive to nations[99] willing to adhere to American nonproliferation policies.[100] To remove the obstacles to prospective customers posed by a lengthy, unpredictable export license application process, Congress streamlined the procedure; Congress, however, also imposed specific stringent nonproliferation criteria to avoid the possibility of aggravating weapons proliferation problems or precipitating occurrences contrary to United States' interests in other respects.[101] As the legislative history demonstrates, among the most important portions of NNPA are Sections 127[102] and 128,[103] which set forth specific nonproliferation criteria that every proposed export must meet, and Section 103(d), which incorporates the non-inimicality provision which had been part of AEA since 1954.[104]

I begin with the premise that the language of Section 103(d) must have some

foisting off products on the underdeveloped countries simply for purposes of opening up markets. Cf. text *supra* at note 45 (expressing congressional concern on the subject). Were PNPP–1 to cause serious problems for the Philippines as the result of an accident, especially one that results from some obvious design defect or which somehow NRC could have cautioned against or prevented by even a cursory review of the proposed reactor, the United States' reputation as both a reliable and responsible supplier of nuclear components would certainly be seriously undermined. See text *supra* at note 80. Cf. *Jurisdictional Decision, supra* note 5, dissenting opinion of Commissioner Bradford at 1–2, J.App. 55–56.

**93.** See *id.* at 17, J.App. 21.

**94.** Petitioners have raised serious questions as to the level of expertise of the Philippines

Atomic Energy Commission. See note 133 *infra.*

**95.** See text *supra* at notes 24–31.

**96.** See text *supra* at notes 32–34.

**97.** See text *supra* at notes 35–42.

**98.** See text *supra* at note 43.

**99.** See text *supra* at notes 30–31.

**100.** See text *supra* at note 31.

**101.** See text *supra* at notes 34–36.

**102.** 42 U.S.C. § 2157 (Supp. II 1978).

**103.** 42 U.S.C. § 2157 (Supp. II 1978).

**104.** See text *supra* at notes 60–62.

continuing efficacy, else it would have been deleted; as the Supreme Court has repeatedly admonished, words of a statute are not to be considered mere surplusage.[105] Accordingly, I have tried to harmonize the statutory language with the House Report's reference to Sections 126 and 127 as "findings in addition to those required by law,"[106] with its statement that "in the absence of unusual circumstances, fulfillment of the [Sections 127 and 128] criteria would ordinarily fulfill the Section 103(d) requirements,"[107] and with the Senate Report's even more cryptic remark that "it should be recognized that certain overseas activities could pose a threat to Americans,"[108] as well as with passages from both the reports and the debates evincing congressional concern with potential environmental consequences[109] and admonishing that NRC is to provide a strong independent check on the judgment of the Executive Branch.[110] Were I engaged in an original interpretation of the statutory language it would be my belief that NRC's proper approach, when faced with an export license application, would be to ascertain whether there are any "unusual circumstances" meriting inquiry beyond the standard evaluation based on the Sections 127 and 128 criteria. This is almost exactly the approach suggested by Commissioner Bradford,[111] and briefed as a possible option by NRC's staff;[112] it would supply a rational explanation for the retention of the non-in-

imicality finding and provide a reasoned approach to the analysis conducted by NRC. In contrast, I find the NRC plurality opinion confusing on this point, and I am unable to fathom the reasoning of its subscribers. Though alluding to the possibility that the proximity of American overseas bases to the proposed reactor might be considered an unusual circumstance,[113] the plurality implied that American bases do not constitute part of the common defense and security.[114]

The plurality similarly made short shrift of petitioners' suggestion that risk of a nuclear accident here is increased by the nature of PNPP–1's site, and that such an occurrence would injure the foreign policy interests of the United States and damage its reputation as a reliable supplier of nuclear technology.[115] In his dissenting opinion, Commissioner Bradford pointed out the questionable wisdom of this omission, noting that "an accident as severe as Three Mile Island would be inimical to the common defense and security ...."[116] Consistent with this view is an opinion by Ambassador Sullivan, United States Ambassador to the Philippines, who stated that

> the Embassy considered a great deal of American prestige [to be] riding on Westinghouse performance, and that therefore we intended to follow the project closely. I pointed out that this was in effect the Filipino Aswan Dam, being the largest and most expensive construction ever undertaken in this country.[117]

---

**105.** See, *e. g., United States v. Campos-Serrano,* 404 U.S. 293, 301, 92 S.Ct. 471, 476, 30 L.Ed.2d 457, 464 (1971); *United States v. Henning,* 344 U.S. 66, 74, 73 S.Ct. 114, 119, 97 L.Ed. 101, 107 (1952); *Washington Market Co. v. Hoffman,* 101 U.S. 112, 115–116, 25 L.Ed. 782, 783 (1879).

**106.** House Report, *supra* note 8, at 22, CRS Legislative History, *supra* note 8, at 435.

**107.** *Id.*

**108.** Senate Report, *supra* note 24, at 13, U.S. Code Cong. & Admin.News 1978 at 338, CRS Legislative History, *supra* note 8, at 469.

**109.** See text *supra* at notes 35–42.

**110.** See text *supra* at notes 8, 55–59.

**111.** See *Jurisdictional Decision, supra* note 5, dissenting opinion of Commissioner Bradford at 3–4, J.App. 57–58.

**112.** See NRC Staff's Submission in Response to Commission's Order Dated Oct. 19, 1979 (Nov. 19, 1979), at 19–24, J.App. 281–286.

**113.** See *Jurisdictional Decision, supra* note 5, at 20, J.App. 24.

**114.** *Id.* at 19–20, J.App. 23–24.

**115.** *Id.* at 18, J.App. 22.

**116.** *Id.,* dissenting opinion of Commissioner Bradford at 5, J.App. 59. See also Letter from C. Foster Knight, Acting General Counsel, CEQ, to John F. Ahearne, Chairman, NRC, Feb. 29, 1980, at 2, J.App. 207.

**117.** Cable from United States Embassy Manila (11505) to Department of State, Sept. 25, 1974; NRC A/R Vol. 12, Doc. 8, quoted in Brief for Petitioner at 7.

While NRC should not be required to explore the intricacies of foreign policy, it takes little to realize that a significant accident attributable to a readily discoverable defect in a reactor exported by the United States—or even a far less egregious malfunction that could have been prevented by NRC during the course of the licensing procedure—could damage the foreign policy interests of the United States. Perhaps most significantly, the reputation of this country as a dependable supplier of nuclear technology could be harmed irreparably.[118]

Nevertheless, NRC has concluded that it need not look at the effects on American interests in this particular situation. As indicated earlier, I believe this to be a debatable result, and would not be prone to uphold it had Congress provided any credible indication beyond what is contained in the legislative history. But both the statutory language and the legislative history are cryptic on this point. Although on balance I believe that the latter—especially the Senate Report's language concerning overseas impacts on the American public[119]—supports the conclusion that more is required of NRC, I perceive no "*compelling* indication that [NRC] is wrong,"[120] and therefore must defer to its judgment.[121] For this reason, and this reason alone, I join Judge Wilkey in affirming NRC on this point.

In so doing, I must confess an inability to understand how NRC can believe that American military bases are not part of the common defense and security of the territorial United States. I agree with Commissioner Bradford[122] that the very reason for

overseas bases is to protect this country and its allies. Nor do I understand why American servicepersons are not part of the public; they are not in the Philippines for personal reasons, but to serve their country. Moreover, to say that the first reactor to be built near American military bases in one of the most seismically dangerous regions on earth[123] is not an unusual circumstance seems strange to me, particularly since this is the first time either event has occurred.[124] Nonetheless, I am forced to defer to NRC's construction on this point, but I do not join Judge Wilkey in concluding that the presence of American bases and American servicepersons and the construction of a nuclear power plant in a seismically active area near four volcanoes are, as a matter of law, not unusual circumstances.[125] If the Commission has any discretion under the statutory scheme, it must encompass primary authority to determine what constitutes unusual circumstances. This court is not involved in the business of licensing nuclear reactor exports, and has no experience with the problems and only limited knowledge of the facts surrounding the construction and operation of nuclear facilities. It is not our function to intrude unnecessarily into this area.

### 4. *NRC's Treatment of the Global Commons*

NRC takes the position that its authority to undertake an evaluation of the effects of PNPP–1 on the global commons is purely discretionary.[126] For substantially the same reasons discussed in connection with American interests abroad, I must yield to NRC's

118. See, *e. g.*, text *supra* at notes 80 and 116.

119. See text *supra* at notes 63 and 108.

120. See note 20 *supra* and accompanying text.

121. See text *supra* at notes 17–20.

122. See *Jurisdictional Decision, supra* note 5, dissenting opinion of Commissioner Bradford at 6, J.App. 60.

123. See notes 14–15 and 83 *supra*.

124. According to the NRC staff "to our knowledge this is the first time a proposed reactor export is to be sited in close proximity to a U.S.

military base," NRC Staff Discussion Paper on PNPP–1, SECY 80–20 (Jan. 15, 1980) at 5, J.App. 218, and according to the IAEA, the site of PNPP–1 poses unique difficulties. See note 14 *supra*.

125. See Wilkey Op., text at notes 88–92. I do agree with Judge Wilkey that NRC may not disregard "any and all posited 'unusual circumstances.'" *Id.* at n.91. This case comes very close to that line, but does not cross it.

126. See *Jurisdictional Decision, supra* note 5, at 27, J.App. 31.

judgment: there is nothing in the legislative history demonstrating that NRC is plainly wrong in so holding.[127] In this instance, however, NRC chose to exercise its discretion affirmatively. It reviewed the potential impact on the global commons on the basis of three generic studies: a programmatic impact statement prepared in 1976 to analyze the overall effects of American nuclear exports,[128] a study on floating nuclear power plants,[129] and a liquid pathway analysis.[130] NRC has concluded that risk to the global commons, if existent at all, is bound to be negligible.[131]

I am troubled by NRC's willingness to predicate its determination on generic docu-

ments alone. This is the more so in light of the special circumstances surrounding PNPP–1—circumstances that caused the International Atomic Energy Authority and prominent environmentalists to conclude that the volcanic and seismic hazards of the site had not been adequately assessed,[132] and a commission appointed by the Government of the Philippines to fear that the reactor might have serious design flaws.[133] Despite this concern, however, I must defer to NRC's expertise,[134] and it is for this reason that I concur in upholding NRC on this point.

NRC should be aware, however, that at some point reliance on aging, generic analy-

---

**127.** See text *supra* at notes 17–20.

**128.** *Final Environmental Statement on U.S. Nuclear Power Export Activities, ERDA–1542* (1976). *ERDA–1542* was prepared pursuant to a consent decree entered into in settlement of a suit brought against AEC, see note 60 *supra*, by the Sierra Club seeking to compel NRC's predecessor to prepare an EIS on the export program. See *Sierra Club v. AEC,* 4 E.L.R. 20685 (D.D.C.). *ERDA–1542*, the product of that settlement, is a generic analysis of the nuclear export program's impacts on United States territory and the global commons.

**129.** *Final Environmental Statement Related to Manufacture of Floating Nuclear Power Plants by Offshore Power Systems,* NUREG–0502 (Dec. 1978).

**130.** *Liquid Pathway Generic Study,* NUREG–0440 (Feb. 1978).

**131.** See *Jurisdictional Decision, supra* note 5, at 38, J.App. 42.

**132.** See, *e. g.,* IEAE 1978 Safety Report, *supra* note 14, at 7; Brief for Petitioners at 12; Brief for Petitioners Center for Development Policy *et al.* in Response to NRC's October 19, 1979 Request for Views on Philippine Export Proceeding (Nov. 19, 1979), J.App. 148 [hereinafter cited as CDP Comments]; Statement of Views on Further Public Proceedings, submitted on behalf of the National Resources Defense Council, Sierra Club and Union of Concerned Scientists (Nov. 19, 1979), at 20–21, J.App. 91–92 [hereinafter cited as NRDC, SC & UCS Comments].

**133.** Following the well-known Three Mile Island incident, the Philippines suspended construction of PNPP–1 effective June 15, 1979 and appointed a special body known as the Puno Commission to study the proposed reactor. *Washington Post,* June 16, 1979, at A2. The report issued by the Puno Commission on

November 16, 1979 declared that PNPP–1 "as designed is not safe," but was based "on an old design plagued with unresolved safety issues," and these problems caused the Commission to conclude that PNPP–1 "needs fundamental changes and additional safeguards." Commission on Nuclear Reactor Plants, "In Re: Inquiry on the Safety to the Public of the Bataan Nuclear Plant [PNPP–1] (per Executive Order 539, June 15, 1979)," at IVB–1 (Nov. 16, 1979), NRC A/R Vol. 12, Doc. 10, quoted in Brief for Petitioners at 10. President Marcos subsequently announced that the reactor would be cancelled if changes were not made to remedy the safety hazards. *Wall Street Journal,* Nov. 14, 1979, at 16; *Washington Post,* Nov. 14, 1979, at A7. According to petitioners, negotiations between Westinghouse and the Philippines still were under way when this case was argued. See Brief for Petitioners at 10.

Although the Government of the Philippines appointed a commission to handle this investigation, it had previously employed an American engineering firm to evaluate the PNPP–1 site. Petitioners have raised questions about the adequacy of the job done by this firm, see Brief for Petitioners at 11–13, as did some of the commentators in NRC's public proceedings. See, *e. g.,* CDP Brief, *supra* note 132, J.App. 148. The United States Geological Survey (USGS) refused to certify the firm's analysis. See NRDC, SC & USC Comments, *supra* note 132, at 165–166; see also *id.* at 141.

**134.** By deference to NRC's expertise in this context, I mean deference to NRC's technical preeminence in the nuclear field, the exercise of which courts may probe only under the abuse of discretion standard. This is to be distinguished from deference accorded to an agency's interpretation of its organic statute. See text *supra* at notes 17–20 and note 20 *supra*.

ses may no longer be acceptable. While the deference we owe the expertise of an administrative agency in circumstances such as these is considerable, should the agency persist in questionable practices and eventually push beyond reasonable limits, a court would be compelled to find an abuse of discretion. Nor is my vote for affirmance in this case intended to justify without more a later NRC holding altering its decision to exercise only a discretionary authority to review the effects of nuclear component exports on the territorial · United States or on the global commons, for as Judge Wilkey admonishes every federal agency has a legal obligation to avoid ad hoc decisionmaking.[135]

## IV.  NRC's NEPA OBLIGATIONS

My comments on the NEPA issues are quite brief. The first inquiry is whether NEPA requires an assessment of the impact of PNPP–1 on the environment of the Phil-

ippines. Since NEPA is addressed to "major Federal actions significantly affecting the quality of the human environment,"[136] an appropriate analysis ordinarily would develop two questions: (a) whether the grant of a license for the export of critical reactor components for PNPP–1 constitutes a major federal action, and (b) whether the issuance of the license significantly affects the quality of the human environment within the meaning of the statute.

As NRC has pointed out,[137] the problem is that Congress has provided little guidance on these matters. Indeed, while fully aware that the extraterritorial application of NEPA[138] remained an open question in the courts,[139] Congress specifically stated that the enactment of NNPA was not to affect decisions on the enforcement of NEPA's environmental policy prescriptions outside the territorial United States.[140] Fortunately, I do not think it necessary in this case to attempt to divine the meaning of either "major federal action" or "human environment."[141]  This is principally be-

---

**135.**  See Wilkey Op., text following note 65.

**136.**  NEPA § 102(2)(C), 42 U.S.C. § 4332(2)(C) (1976).

**137.**  See *Jurisdictional Decision, supra* note 5, at 21, J.App. 25.

**138.**  My reference here should not be taken as an indication that I accept NRC's claim that a requirement of an environmental impact statement for issuance of an export license would constitute an extraterritorial application of NEPA or any other domestic statute. The licensing procedure takes place entirely within the United States, and domestic law completely expends its force then and there. See text *supra* at note 47. I agree with Judge Wilkey, however, that the views of Congress with respect to extraterritoriality of the statutes at issue are relevant because many of the effects of NRC's licensing actions are felt elsewhere in the world. See Wilkey Op., text following note 51.

**139.**  In several cases the courts have required environmental impact statements for federal actions producing repercussions outside the United States. In most of these cases, however, there has been a special relationship, either geographical or political, between the recipient country and the United States, see, *e. g., Wilderness Soc'y v. Morton,* 150 U.S.App.D.C. 170, 463 F.2d 1261 (1972); *People of Enewetak v. Laird,* 353 F.Supp. 811 (D.Hawaii 1973); *People of Saipan ex rel. Guerrero v. Department of the Interior,* 356 F.Supp. 645 (D.Hawaii

1973), and in *Sierra Club v. Adams,* 188 U.S. App.D.C. 147, 578 F.2d 389 (1978), we assumed, without deciding, that NEPA applied to federal construction in Panama.

**140.**  According to Senator McClure, it was "the intent of the sponsors that the bill remain neutral on the issue of the NEPA requirements for these exports .... [It is] not intended to prejudice one way or the other the current debate on the NEPA application to international activities .... [It] in no way prejudices positively or negatively the current debate on the application of NEPA to nuclear exports." 124 Cong. Rec. S1449–1450 (daily ed. Feb. 7, 1978) (remarks of Senator McClure), CRS Legislative History, *supra* note 8, at 718; see also, *e. g., id.* at S1453 (remarks of Senator Glenn), CRS Legislative History, *supra* note 8, at 725.

**141.**  NRC has taken the position that "[t]he health, safety, and environmental impacts from individual fuel shipments or component shipments are generally *de minimis* and [therefore] are not 'major federal actions.' " *Jurisdictional Decision, supra* note 5, Order at 1, J.App. 3. This view was previously adopted by NRC in *Edlow Internat'l,* CLI–76–6, 5 N.R.C. 563, 584 (1976). Petitioners, in comments submitted to NRC, took the opposite position, arguing that

> [t]here is no question that issuance of an export license for a nuclear facility or nuclear components is a "major federal action significantly affecting the quality of the human environment" within the meaning of Section

cause another consideration assumes paramount importance.

In *Flint Ridge Development Co. v. Scenic Rivers Association*,[142] the Supreme Court ruled that even assuming a major federal action significantly affecting the human environment, NEPA's requirement of preparation of a detailed (EIS) must yield where a clear conflict in statutory authority is unavoidable.[143] There the Interstate Land Sales Full Disclosure Act[144] provided that a property report on specific housing-related items required of developers would automatically become effective thirty days from the date of filing unless the Secretary of Housing and Urban Development determined that the report was inaccurate or incomplete in some material respect.[145] The Court deemed this statutory directive antithetical to NEPA's EIS mandate because drafting, circulation, comment, and revision of such a statement could not possibly be completed within thirty days. The Secretary was thus absolved from the obligation of supplying an EIS.[146]

The time frame is far less circumscribed in the instant case, since NRC has at least 180 days to act on each export license application.[147] And, it is conceivable that preparation of an EIS could be included in the public-proceeding stage of NRC's review of export license applications, at which time the agency might set aside a period additional to the normal time limit for public comment on the EIS.[148] Consequently, a statutory clash is not so evident here as it was in *Flint Ridge*. But NRC has emphasized the difficulty of arranging to acquire all the necessary data,[149] the NRC staff has

201(2)(C) of NEPA, and a "major Commission action" within the meaning of 10 C.F.R. § 51.5(a)(10). In the domestic context the Commissioner's licensing of the construction or operation of a nuclear reactor has repeatedly been held to be a major federal action. *Calvert Cliffs Coordinating Comm. Inc. v. U. S. Atomic Energy Agency*, 449 F.2d 1109 (D.C.Cir.1970); *Citizens for Safe Power, Inc. v. Nuclear Regulatory Commission*, 524 F.2d 1291 (D.C.Cir.1975); *Aeschliman v. Nuclear Regulatory Commission*, 547 F.2d 622 (D.C.Cir.1976), *Rev'd on other grounds sub nom. Vermont Yankee Nuclear Power Corp. v. NRDC* [435 U.S. 519], 98 S.Ct. 1197 [55 L.Ed.2d 460] (1978). Since the environmental impact of a nuclear reactor is significant whether it is to be constructed in the U.S. or elsewhere, there is no logical reason to distinguish between the licensing of an exported and a domestic facility. Both are "major federal actions" giving rise to very similar environmental impacts and consequences. Both require the preparation of an environmental impact statement.
NRDC, SC & UCS Comments, *supra* note 132, at 20–21, J.App. 91–92.
Judge Wilkey seems to assume that issuance of the export license for PNPP–1 did constitute a major federal action. See Wilkey Op., text following note 114. As noted in text, I see no reason to decide the question. To do so unnecessarily would anticipate the debate over NEPA's international scope in a case where that precise question is not before us, and consequently where there is no call for a canvass of the extensive legislative history with such a broad decision in mind. As petitioners have pointed out, see Brief for Petitioners at 58–66, a number of passages in its legislative history support the idea that NEPA may apply to major federal actions outside the territorial United States, and several commentators have adopted the view that NEPA does extend beyond our borders. See *id.* at 68 n.2. There are some contrary indications, however, as well as some commentators who have adopted the opposite view.

142. 426 U.S. 776, 96 S.Ct. 2430, 49 L.Ed.2d 205 (1976).

143. *Id.* at 788, 96 S.Ct. at 2438, 49 L.Ed.2d at 216.

144. Pub.L.No.90–448, 82 Stat. 590 (1968), as amended, 15 U.S.C. §§ 1701 *et seq.* (1976) [hereinafter cited as codified].

145. 15 U.S.C. § 1706(a) (1976).

146. *Flint Ridge Dev. Co. v. Scenic River Ass'n, supra* note 142, 426 U.S. at 791, 96 S.Ct. at 2440, 49 L.Ed.2d at 218.

147. See NNPA § 126, 42 U.S.C. § 2155 (Supp. II 1978). The precise procedure is outlined in text *supra* at notes 47–54.

148. See *Jurisdictional Decision, supra* note 5, at 13, J.App. 17. A public proceeding period is provided for in § 126 of NNPA, 42 U.S.C. § 2155 (Supp. II 1978). Although NRC has discretion to determine when to request public comment, Congress clearly intended that this procedure would be utilized with some degree of regularity. See note 59 *supra* and accompanying text.

149. See *Jurisdictional Decision, supra* note 5, at 23, J.App. 27; Brief for Respondent NRC at 31–32.

estimated that preparation of a detailed EIS would take two years,[150] and the process could be further bogged down by litigation over the adequacy of the impact analysis.[151] Considering the circumstances, I am forced to agree that the period NRC could count on might not be sufficient.[152]

Even more persuasive is the congressional concern with expedition in export licens-

ing—an objective that runs directly counter to the notion that a formal EIS was intended to be a precondition to an export license.[153] Thus, while *Flint Ridge* may not be controlling here, I believe the situation is analogous enough to warrant adherence to its rationale.[154] These considerations, along with the foreign policy concerns articulated by NRC[155] and the deference owed the Commission's interpretation of NEPA,[156]

**150.** See Brief for Respondent NRC at 45 n.85. See also *Jurisdictional Decision, supra* note 5, at 13, J.App. 17.

**151.** See Wilkey Op., text following note 116. But see 124 Cong.Rec. S1449 (daily ed. Feb. 7, 1977) (remarks of Senator McClure), CRS Legislative History, *supra* note 8, at 718; 123 Cong.Rec. 30298 (1977) (remarks of Representative Derwinski), CRS Legislative History, *supra* note 8, at 884, demonstrating that at least some members of Congress were aware of the possibility of such litigation. Once again, the difficulty we face is clear: the few hints of congressional intent are often ambiguous and sometimes conflicting. We have the purported neutrality of Congress with respect to NEPA's application to NRC export licensing procedures, see note 140 *supra* and accompanying text, as well as Congress' awareness of the potential for time-consuming litigation. These indications are counterbalanced by Congress' emphasis on expedition in nuclear component export licensing. See note 31 *supra* and accompanying text.

**152.** I note that in the instant case the license application was pending before NRC for 42 months; most of this time lag was due to deferral requested by the State Department. See *Jurisdictional Decision, supra* note 5, at 1, J.App. 5. Obviously NRC could have prepared an EIS within this time, but I feel that we must focus on the statutory prescription here rather than the actual interval. NRC must have some freedom to plan its schedule and allocate resources on a predictable basis, and the duties of the agency should not turn on whether the State Department requests a delay.

**153.** Congress was anxious to insure that export license applications would be reviewed quickly and efficiently by NRC. See note 31 *supra* and accompanying text.

**154.** The fact that preparation of an EIS possibly could be accommodated in the preceding stage of the export licensing process does not necessarily distinguish this case from *Flint Ridge*, for there the Secretary of HUD had discretionary power to suspend the effective date of the required disclosure statement if it were found lacking in some material respect. See 426 U.S. at 781, 96 S.Ct. at 2435, 49 L.Ed.2d at 212. Conceivably an EIS could have

been included with the report and if found inadequate could have served as a basis for suspension, but the Supreme Court did not view the problem in this manner. See *id.*

**155.** NRC was afraid of arousing resentment of foreign governments by excessive intrusions for purposes of environmental assessments. See *Jurisdictional Decision, supra* note 5, at 23, J.App. 27. Such concerns were also voiced in Congress. See note 46 *supra* and accompanying text.

**156.** I am mindful of the contrary view of CEQ, whose specific area of expertise encompasses the interpretation of NEPA and whose statutory mandate includes oversight of NEPA's application. See NEPA § 204, 42 U.S.C. § 4344 (1977); see also Exec.Order No. 11991 (1977) (giving CEQ authority to promulgate NEPA regulations binding on other agencies). CEQ has consistently taken the position that "[t]he language and legislative history of [NEPA and] the law of the United States require that impact statements be prepared for agency actions carried out within the territorial jurisdiction of other nations." Legal Advisory Committee, Report to the President's Council on Environmental Quality at 14 (1971); accord, 40 C.F.R. § 1500.a(a)(3)(i) (1974); Memorandum to Heads of Agencies on Applying the EIS Requirement to Environmental Impacts Abroad, *reprinted in* 42 Fed.Reg. 61068, 61069 (1977); Memorandum from Charles Warren, Chairman, to Heads of Agencies, Jan. 19, 1978. In this specific instance, CEQ did not insist upon an EIS addressing the effects of PNPP–1 within the Philippines, but urged that at a minimum some supplement to ERDA–1542, see note 128 *supra*, was necessary with respect to the evaluation of effects on United States territory and the global commons. See CEQ Letter, *supra* note 116, at 1, 3, J.App. 206, 208. Petitioners also inform us that other agencies have generally prepared EIS's for federal actions with significant effects within the territories of other countries. Brief for Petitioners at 67, citing, *e. g.*, Dept. of the Navy, *FEIS for the Proposed Removal of the Argus Island Facility-Bermuda*, No. 73–1898 (1973); Dept. of Commerce, *Final Environmental Statement, Importation of South African Sealskins*, No. 73–1380 (1973); Dept. of Transportation, *Darien Gap Highway,*

prompt me to join Judge Wilkey in acceding to NRC's determination that no formal EIS is required with respect to the effects of PNPP–1 on the environment of the Philippines.

I hasten to add, however, that this position does not imply that NRC may ignore its other NEPA obligations. As the Supreme Court cautioned in *Flint Ridge*, a determination that a formal EIS is unnecessary "is not to say that environmental concerns are irrelevant."[157] For example, pursuant to NEPA's policy directives[158] and its provision for multinational cooperation[159] the Commission has inaugurated information interchange programs and other cooperative efforts,[160] and certainly it should continue to pursue these diligently. NEPA sets forth the policy of the United States with respect to the ecological well-being of this planet in recognition of its importance

to the health and welfare of its people.[161] In addition to the specific EIS requirement, NEPA admonishes federal agencies to

recognize the worldwide and long-range character of environmental problems and, where consistent with the foreign policy of the United States, lend appropriate support to initiatives, resolutions, and programs designed to maximize international cooperation in anticipating and preventing a decline in the quality of mankind's world environment . . . .[162]

In this regard, Congress has commanded federal agencies to comply with NEPA's directives "to the fullest extent possible,"[163] and NRC should remain cognizant of this responsibility. And just as the Supreme Court noted with respect to the dictates of the conflicting statute in *Flint Ridge*,[164] I hasten to add that my view of NEPA's operation here is in no way intended to reflect on the environmental assessments that NNPA may demand of NRC.[165]

---

*Final EIS-Panama-Columbia*, No. 76–0867 (1976); Dept. of the Interior, *Final Environmental Statement, World Heritage Convention*, No. 73–0621 (1973); Dept. of State, *EIS on the Agency for International Development Pest Management Program*, No. 77–0593 (1977); ERDA, ERDA–1542, *supra* note 128.

157. 426 U.S. at 792, 96 S.Ct. at 2440, 49 L.Ed.2d at 218.

158. See NEPA § 2, 42 U.S.C. § 4321 (1976), quoted in note 161 *infra*.

159. See NEPA § 102(2)(F), 42 U.S.C. § 4332(2)(F) (1976), quoted in text *infra* at note 162.

160. See *Jurisdictional Decision, supra* note 5, at 41–42, J.App. 45–56.

161. See, *e. g.*, NEPA § 2, 42 U.S.C. § 4321 (1976), which provides:
The purposes of [NEPA] are: To declare a national policy which will encourage productive and enjoyable harmony between man and his environment; to promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man; to enrich the understanding of the ecological systems and natural resources important to the Nation; and to establish a Council on Environmental Quality.
See also, *e. g.*, 42 U.S.C. § 4332, which in pertinent part provides:
The Congress authorizes and directs that, to the fullest extent possible: (1) the policies, regulations, and public laws of the United States shall be interpreted and administered

in accordance with the policies set forth in this chapter, and (2) all agencies of the Federal Government shall—
(A) utilize a systematic, interdisciplinary approach which will insure the integrated use of the natural and social sciences and the environmental design arts in planning and in decision-making which may have an impact on man's environment;
(B) identify and develop methods and procedures, in consultation with the Council on Environmental Quality . . . which will insure that presently unquantified environmental amenities and values may be given appropriate consideration in decisionmaking along with economic and technical considerations . . . .

162. NEPA § 102(2)(F), 42 U.S.C. § 4332(2)(F) (1976).

163. NEPA § 102(2)(C), 42 U.S.C. § 4332(2)(C) (1976). See *Jurisdictional Decision, supra* note 5, at 38–39, J.App. 42–43. I agree with Judge Wilkey that "[c]onstruing the equivocal reach of NEPA abroad . . . is a judicial endeavor oft-encountered but not yet fully realized by any court," and that "[w]e, too, [should] face this issue tentatively." Wilkey Op., text following note 47.

164. 426 U.S. at 792, 96 S.Ct. at 2440, 49 L.Ed.2d at 218.

165. They may well be substantial. See Part III *supra*.

The second NEPA issue in this litigation is the validity of NRC's finding that the grant of the PNPP–1 export license will have no significant effect on the global commons.[166] In reaching this conclusion, NRC relied principally upon a 1976 programmatic impact statement—*ERDA* –1542 —examining the effects of the entire nuclear export program of the United States on the global environment.[167] This analysis is considered to be outdated by many environmentalists as well as by CEQ, which has stated flatly that *ERDA* –1542 is "insufficient for considering the environmental effects of the proposed Philippine reactor export under NEPA . . . ."[168] Still, mindful of the teachings of *Flint Ridge* and the deference due NRC, I am constrained to conclude that petitioners have not advanced a reason substantial enough to invalidate NRC's decision on this basis. The Commission has assigned these data current value, and surely it has acted in good faith; as a judge, I am hardly in position to override this appraisal. NRC should, however, remain cautious in fulfilling its duties, and receptive to the concerns of coordinate expert agencies and public interest groups, as Congress clearly intended.[169] With respect to NEPA as well as NNPA, it is not beyond the realm of possibility that on-going reliance on dated information without any evaluation of the data's continuing efficacy, could result in a finding of abuse of discretion by NRC in some later litigation.

## V. CONCLUSION

Judge Wilkey optimistically asserts that "nonproliferation, safety, and nuclear exports from the United States march in tandem."[170] Congress may indeed have fashioned a statutory scheme capable of stimulating reactor sales while furthering the goals of nonproliferation, and all humanity should hope that it did. I must agree with petitioners, however, that NRC's interpretation of its role in the export licensing process invites grave reservations about the safety of the PNPP–1 reactor. As Commissioner Bradford points out, surely some obligation rests on "suppliers of a potentially dangerous technology, to fully inform the purchaser of the best information that we can develop."[171]

By my estimate, the decision we render today, does not necessarily portray the United States as a more responsible exporter of nuclear technology than the "less responsible" suppliers spoken of by Judge Wilkey.[172] In the first place, we have nothing before us to support the premise that the United States has a monopoly on safe nuclear power plants;[173] in fact, PNPP–1 was found to have serious flaws as original-

166. See note 71 *supra*.

167. See note 128 *supra*.

168. CEQ Letter, *supra* note 116, at 2, J.App. 207.

169. The legislative history of NNPA evidences congressional intent to make public comment a part of the export licensing procedure. See note 59 *supra* and accompanying text.

170. Wilkey Op., text preceding note 1.

171. See *Jurisdictional Decision, supra* note 5, dissenting opinion of Commissioner Bradford at 3, J.App. 57. See also note 92 *supra*.

172. See, *e. g.*, Wilkey Op., text preceding note 1.

173. While American corporations are undoubtedly at least as responsible and well-intentioned as their counterparts in other nuclear exporting countries, problems are not unheard of in this complex field. For example, one NRC staffer noted that

U.S. manufacturers have extremely poor records of information disclosure to foreign purchasers; they term many items as proprietary which are readily made available to Regulatory Designs at times do not reflect all the regulatory items required in the U.S.; at times design innovations are first tried by U.S. manufacturers in overseas reactors.

U.S. manufacturers normally deal with foreign utility companies, and short cut their assistance to foreign governmental control groups, which are sometimes in weak governmental positions. Most foreign countries possess only rudimentary and inadequately staffed control groups, which are inferior technically to the utility staffs . . . .

Staff Memorandum prepared by A.S. Friedman, August 10, 1972, quoted in Statement of Views on Further Public Proceedings, submitted on behalf of Natural Resources Defense Counsel, Sierra Club and Union of Concerned Scientists, *Westinghouse Elec. Corp.*, NRC Doc.No.110–0495 (Nov. 19, 1979).

ly designed.[174]  To boot, by affirming NRC today, we sanction its rejection of all obligation to employ its technological expertise in this area, even to determine whether the reactor in question has any obvious safety flaws.  That another nuclear exporting country might do the same is no reason to assume that Congress intended the United States to complicate matters by joining the ranks of the "less responsible."

Yet in the end, whether pragmatically NRC's performance is applauded or condemned, its outcome in this case seems to remain beyond legal reproach.  No explicit statutory command has been disobeyed, nor

any unmistakable legislative signpost ignored;  at most, NRC has made a choice among signals—always weak and sometimes conflicting—that have emanated from the halls of Congress.  Those discernible here, though read divergently by a jurist, do not provide a sound foundation for overturning the agency's interpretation of its procedural responsibilities.  In sum, I cannot be sure that NRC is right, but I certainly cannot declare it wrong.

---

**174.**  See note 133 *supra.*